SURRENDER OF MINOR CHILDREN.

Hampden.    September 27, 1961. — April 26, 1962.

Present: WILKINS, C.J., SPALDING, WHITTEMORE, CUTTER, & KIRK, JJ.

*Adoption. Parent and Child. Undue Influence. Unsound Mind. Duress. Mistake.*

If a parent of a child, voluntarily and with full understanding, consents
to adoption of the child by surrendering him for adoption under G. L.
c. 210, § 3, such consent of the parent may be withdrawn only by per-
mission of the Probate Court, the giving or withholding of which is
governed by the welfare of the child.   [234]

Facts showing the circumstances in which a moron mother of several illegit-
imate children, following talks with an agent of a charitable institution
and a court investigator, and at a time when she was awaiting trial on a
misdemeanor charge, was "completely convinced" that she was facing
imprisonment for a substantial period, and was aware that the children's
grandmother could not care for them, executed surrenders of the children
to the charitable institution for adoption under G. L. c. 210, § 3, did
not justify a conclusion that the surrenders were due to undue influence
on the part of the institution's agent or the investigator, or to mental
weakness of the mother amounting to lack of comprehension of the
nature of what she was doing, or to duress from pressure of the cir-
cumstances, or to material mistake of fact respecting her prospective
imprisonment, nor justify a ruling by the Probate Court that the sur-
renders were void, but, on the contrary, required a conclusion that
they were given voluntarily and with full understanding.   [234–237]
KIRK, J., dissenting.

If a ruling of a Probate Court meant that, although consent of a mother
to adoption of her child given by surrendering the child for adoption
under G. L. c. 210, § 3, was voluntary and with full understanding, it
might be withdrawn by permission of the court based solely on consid-
erations of justice to the mother without regard to the welfare of the
child, the ruling would be error.   [237]

PETITION filed in the Probate Court for the county of
Hampden on June 1, 1960.

The case was heard by *Smith*, J.

*David R. Pokross*, (*Edward A. Saxe* with him,) for the
petitioner.

*Michael J. Donohue*, for the respondent.

WHITTEMORE, J.   The mother, who had never married, on April 4, 1960, executed four documents, each purporting to "surrender . . . to the Massachusetts Society for the Prevention of Cruelty to Children [the Society] . . ., for the purpose of adoption," the minor child of the mother named therein, and to "give . . . [the mother's] consent irrevocably to any adoption proceedings approved by the said charitable institution."   The mother on April 26, 1960, sent to the Society a purported revocation of the surrenders.   The Society on June 1, 1960, acting under G. L. c. 210, § 3A, inserted by St. 1953, c. 593, § 1, petitioned the Probate Court for the county of Hampden to determine whether the mother's consent was required for subsequent petitions for adoption.   The judge in the Probate Court decreed that the surrenders are void and that the petition be dismissed.

Additional facts, as found in a report of material facts, are stated in this and following paragraphs.   The mother, classified as a moron with an I. Q. of 60, had been confined to the Belchertown State School for six years from January 20, 1949, to April 24, 1955, and had been discharged "against the recommendation of the school authorities." In March, 1960, she was pregnant and in jail awaiting trial for fornication.   She was also then the complainant in a bastardy proceeding.   The Society on March 25 brought a proceeding under G. L. c. 119, §§ 24–26, as appearing in St. 1954, c. 646, § 1, which authorize that a neglected child be committed to the custody of the department of public welfare or other appropriate order made.   The petition alleged in substance that the children were growing up under conditions or circumstances damaging to their sound character development, and that they lacked proper attention.

The surrenders of April 4 followed a talk of the mother on March 25, 1960, with an agent of the Society and with the investigator appointed in the c. 119 proceeding and also a later talk with the investigator.   The investigator's report dated April 1, 1960, concluded: "It is my feeling that the needs of these children would be best served by: remov-

ing them permanently from this mother's and grandmother's influence by permanent adoption . . . . This could be accomplished either by this mother signing an adoption surrender . . . or, if she is unwilling . . . by committing all four children to the Division of Child Guardianship . . . [which] could get an order from a Probate Court . . . [dispensing with] the mother's signature . . . . In any event, I do not feel it is in the best interests of these children to remain with the grandmother because of her age and limited abilities. I further feel it would be beneficial to this mother and her coming child . . . [for her] to be placed at the Massachusetts Correctional Institution for Women in Framingham where she could receive institutional care and casework services, and from where, after the birth of her coming child, she could be recommitted to the Belchertown State School.'' These recommendations were dictated by the Society's agent inasmuch as the investigator did not feel competent to make a recommendation and adopted those of the agent as her own. On April 12, 1960, by an order in the proceeding under c. 119, the District Court placed the children in the custody of the department of public welfare, thus, we assume, finding ''the allegations in the petition proved within the meaning of this chapter'' (§ 26). The department thereupon arranged with the Society to place the children in foster homes. The order of April 12 was confirmed on appeal to the Superior Court. The mother on April 12 pleaded guilty to fornication; her appeal from the sentence of two months in the house of correction was pending at the time of the Probate Court hearing. The fifth child was born in September, 1960, and remained in the mother's care and custody.

No threats were made in the talk on March 25. There ''was talk of . . . the mother's going to jail for two years.'' The investigator said arrangements could be made at the reformatory in Framingham for the birth of the baby. At the later talk the investigator pointed out the advantages of releasing the children for adoption and recommended this course. The mother, because of her pregnancy and arrest,

was "less resistive" to the idea of releasing her children than she had been earlier from 1957 to 1959 when the Society had urged that course. After April 5, 1960, when she retained an attorney, she learned for the first time that the maximum sentence for fornication was three months. On April 4, she "was completely convinced that she was facing a jail sentence of at least two years. She was also aware that . . . [the grandmother] could not care for her four children alone." The notary who took the mother's acknowledgment on the instruments of surrender testified that she was hesitant "because it would be against . . . [the grandmother's] wishes."

The firm but "mistaken view" of the mother (held "because of . . . talks . . . with the representatives" of the Society) that she was to be committed to jail for two years on the day following April 4, "was the trigger mechanism which prompted her to execute these surrenders." She was not then "in full possession of all her faculties and free from any influence, coercion or duress." These facts and her limited mental capacity and her awareness that the grandmother was unable alone to provide adequate care put the mother "in a state of mind where the slightest influence brought to bear on her to release said children for adoption, would be effective." The judge "therefore . . . [found] that to honor surrenders made under these circumstances would not tend to the doing of justice and declare[d] them void."

He also ruled that "[b]ecause of the improper manner in which the acknowledgments were taken . . . the surrender of . . . Cheryl Ann, who was then less than one year old, was in direct violation of G. L. c. 210, § 2, and therefore void."

General Laws c. 210, § 3, as amended through St. 1955, c. 89, provides, inter alia, in respect of the requirements in § 2 of certain assents to adoption, that "a giving up in writing of a child, for the purpose of adoption, to an incorporated charitable institution or the department of public welfare shall operate as a consent to any adoption subse-

quently approved by such institution or said department."

We hold that the rule is applicable which has been formulated for cases of voluntary assent of a parent to a specific adoption; if given "with a full understanding of every fact necessary to such consent" it may be withdrawn only with the consent of the probate judge. *Wyness* v. *Crowley,* 292 Mass. 461, 464. *Kalika* v. *Munro,* 323 Mass. 542. *Ellis* v. *McCoy,* 332 Mass. 254, 258. *Adoption of a Minor,* 338 Mass. 635, 642. See *Dumain* v. *Gwynne,* 10 Allen, 270; *Hurley* v. *St. Martin,* 283 Mass. 415; 28 U. of Chicago L. Rev. 564, 571. The judge in granting or withholding assent is to "be guided by the established principles governing the disposition of petitions for adoptions, the most fundamental of which is that the paramount issue is the welfare of the child." *Erickson* v. *Raspperry,* 320 Mass. 333, 335. See *Richards* v. *Forrest,* 278 Mass. 547, 553–555.

The decisive issue on this appeal is whether the mother's assent was voluntary and with the requisite "full understanding."

The findings of fact do not in our view, for the reasons next stated, permit the ruling of law that the surrenders were "void," as the judge ruled. On the contrary, they require the conclusion that the mother's act was voluntary and "with a full understanding of every fact necessary to such consent."

There is no finding or basis for a finding of undue influence. It was the duty of the agent of the Society to put before the mother those considerations which tended to show that the welfare of her children required adoption. It was not undue influence to show the mother (1) the adverse effects on her growing children of a pattern of conduct to which she appeared committed, (2) the likelihood that she would be unable to care for the children because, in their interests and her own, it was probable that she would be confined for some time, (3) the inability of relatives to provide care, and (4) the advantages of adoption in the circumstances. There is no basis for inferring that more than this was done. As in will cases, to be undue the influence

must so far dominate the will of the other that the resulting action is not "the act of the person whose act it is in form, but the act of the person exercising the undue influence." *Phillips* v. *Chase,* 203 Mass. 556, 560 (an adoption case). "[I]nfluences may be persuasive and effective, but, so long as not coercive, they are not undue." *Neill* v. *Brackett,* 234 Mass. 367, 370.

The findings do not justify a conclusion that the surrenders were void for mental weakness or insufficiency. The test is, "was the party . . . in such a state of insanity . . . as to render him incapable of transacting the business." *Reed* v. *Mattapan Deposit & Trust Co.* 198 Mass. 306, 314. That test is not met, nor is the criterion stated in *Sutcliffe* v. *Heatley,* 232 Mass. 231, 232–233: "If she could not understand the nature and quality of the transaction or grasp its significance, then it was not the act of a person of sound mind." The findings, although they establish the mother's "mental weakness," do not show "lack of power to comprehend," *ibid.* See also *Meserve* v. *Jordan Marsh Co.* 340 Mass. 660, 662, 667–668. On the contrary, they require the conclusion that the mother understood precisely what she was doing, was reluctant principally because her mother would object, and acted for the paramount, sound reason that she believed she would be confined for some time and unable to care for her children.

There is no evidence of duress in the precise meaning of the term. There is no finding, or basis for a finding, that the Society did anything designed to overcome the mother's will and compel assent and which had that effect. See *Freeman* v. *Teeling,* 290 Mass. 93, 94–95. The judge, however, has found in substance that the circumstances coerced the mother; her plight, her mistaken view that a two year jail term was in prospect and her awareness that the grandmother alone could not care for the children put her under some duress or coercion.

Without pausing to determine if the operative circumstances referred to could be ruled to be duress, we note that the point is otherwise disposed of. There was no significant

mistake in respect of the prospect of confinement. The decisive circumstance in this respect was that the mother would not be able to care for her children because she was to be confined for two years; not that the confinement would be in a particular place. It was reasonably in prospect that the mother would be confined, and separated from her children, for at least two years. It is true that G. L. c. 272, § 18, provides for imprisonment for fornication for not more than three months. However, a woman found guilty of the misdemeanor may, under G. L. c. 279, §§ 16, 17, and 18, as amended through St. 1956, c. 715, § 24, be given an indeterminate sentence in the reformatory for women, the maximum length of which would be two years. *Platt* v. *Commonwealth,* 256 Mass. 539. It was likely that the mother would be sent to the reformatory and that further confinement in Belchertown would follow. In view of the report of the investigator it is probable also (although not important) that, even if the term "jail" was used, what was referred to, or in mind, was the reformatory.

What has been said disposes of the suggestion of material mistake of fact.

Contemplation of the surrender of one's own child is in many, if not all, cases a cause of emotional and mental stress. Many such surrenders are undoubtedly by mothers of children born out of wedlock and are contemplated because the trying circumstances tend to show that the welfare of the child calls for action at variance with that dictated by natural instincts of maternal love and affection. No statute has said that surrenders are valid only if executed free from emotion, tensions, and pressures caused by the situation. No principle of law requires the rule. A balance of the interests of the persons concerned and of society weighs strongly against it.

The findings establish that all the operative circumstances mentioned by the judge were properly and unmistakenly in contemplation by the mother and that they were good reasons why a person who understood them would decide to surrender her children. We rule, therefore, that

the mother had a fully adequate "understanding of every fact necessary to . . . [her] consent." *Wyness* v. *Crowley,* 292 Mass. 461, 464. The pressure of the circumstances and the reasonable expectation in respect to confinement did not make the surrenders involuntary within the rule. There was nothing comparable to the threat to foreclose in *Governor Apartments, Inc.* v. *Carney,* 342 Mass. 351, 354–355.

Underlying the judge's action is the finding that "to honor surrenders made under these circumstances would not tend to the doing of justice." If this is intended as a ruling that the surrenders, though "voluntary" and given with "full understanding" may be revoked with the assent of the judge without regard for the welfare of the children and solely on considerations of justice to the mother, it is wrong. Undoubtedly, regarding the issue solely from the standpoint of the mother, the judge was right that it was just to let her revoke the surrenders when events happened otherwise than expected. But the welfare of the child comes first and the rights of society must be regarded.

We need not determine whether the acknowledgment in respect of the child less than a year old complied with G. L. c. 210, § 2, as appearing in St. 1950, c. 737, § 1, which requires that "consent . . . be attested" if relating to such a child. A suggestion of death of the child has been made.

The decree is reversed. A decree is to be entered in the Probate Court declaring that, unless there be approval by the court of the revocation of the surrenders, in proceedings appropriate thereto, the consent of the mother to subsequent adoption of the three living minor children described in the petition is not required.

*So ordered.*

KIRK, J. I disagree. I would affirm the decree without prejudice to further action by the Society, within the framework of the law, to provide for the welfare of the children. G. L. c. 119.

It is my duty to state the reasons for my dissent.

The opinion telescopes care and custody proceedings before the District Court under G. L. c. 119, §§ 23–26, into

adoption proceedings under G. L. c. 210, §§ 2 and 3, which are not before the Probate Court. It cites authorities and adopts reasoning which, however valid they may be in such proceedings and in guardianship proceedings under G. L. c. 201, § 5, are quite foreign to the narrow issue here presented to the probate judge.

The only matter before the Probate Court is *"a proceeding, independent of a petition for adoption"* (c. 210, § 3A), to establish whether the consent of the mother shall be required to any subsequent petition for adoption of the children who had been placed in the care of the Society under the provisions of G. L. c. 119 (emphasis supplied). In considering this matter, the following should be borne in mind: (a) the children had not been previously adopted; (b) there is no petition for adoption now pending, either (i) under G. L. c. 210, § 2, where the consent of the mother is required, or (ii) under c. 210, § 3, where the consent of the mother may be dispensed with if she has been adjudged to be the kind of person, defined in the latter statute, whose consent is not required. The mother has not been so adjudged.

The sole question, therefore, is whether the instruments of surrender (G. L. c. 210, § 3) signed by the mother on April 4, 1960, were binding on her. The resolution of the question depends, in the first instance, upon a determination whether the surrenders were made "voluntarily and with a full understanding of every fact necessary to such [surrenders]" and "in full recognition of the legal effect of [them]." See *Wyness* v. *Crowley,* 292 Mass. 461, 464; *Kalika* v. *Munro,* 323 Mass. 542; *Ellis* v. *McCoy,* 332 Mass. 254, 258. Such a determination is one of fact. The probate judge is the fact finder and he, after considering all the evidence, oral and documentary, resolved it against the Society. His finding, by long standing precedent, in the absence of a report of the evidence and of inconsistencies in his report of material facts, should be conclusive. See *Silke* v. *Silke,* 325 Mass. 487, 489–490, 492–493, and cases cited; *Goldman, petitioner,* 331 Mass. 647, 652. It should control here. What I regard as a departure by the majority from

a canon of review deeply rooted in our judicial process, is, in my judgment, regrettable and unfortunate.

Furthermore, to my mind, the judge, on the facts reported by him under c. 215, § 11, was plainly warranted in finding that the surrenders were not given voluntarily and with a full understanding of their legal effect. Representatives of the Society had seen the mother "on several occasions between October, 1957, and March, 1959, and attempted to influence her to release her children for adoption, but she steadfastly refused." On March 25, 1960, one week after her arrest for fornication, while still in jail and three months' pregnant, she was "interviewed" by two agents of the Society, and "while no threats of jail were made . . . there was talk of her going to jail for two years." On that day also the local executive of the Society instituted proceedings against her under c. 119, § 24. At least one interview followed. The mother was "under pressure" and became "less resistive to the idea of releasing her children for adoption because of this pressure." On April 4, 1960, without legal counsel, with advice from no one other than the Society's representatives, with her court appearance scheduled for the following day, being "completely convinced that she was facing a jail sentence of at least two years," with an awareness that her own mother could not care for the four children alone (for at least two years?), not being "in full possession of all her faculties and free from any influence, coercion or duress," and "in a state of mind where the slightest influence brought to bear on her to release said children for adoption, would be effective," she "hesitatingly" signed the surrenders before a notary public. The next day, April 5, 1960, when she retained counsel, the mother was told that the maximum jail sentence for her offence was three months.

The foregoing are the circumstances in which the mother, a moron with an I. Q. of 60, signed papers which would result in her surrendering forever the care, custody and control of her children (c. 210, § 6). It is in the light of these circumstances that the voluntary nature and hence the val-

idity of the surrenders must be judged. I feel strongly that the majority is not justified in ruling that these circumstances do not permit a finding by the judge that the surrenders were not voluntarily executed. In my opinion, despite the worthy objectives of the Society, the methods here used by its representatives present a flagrant example of overreaching and opportunism and state a case which, far from calling for a reversal, admits of no other conclusion than that the surrenders were not the product of any meaningful act of volition on the part of the mother. The majority now rules as a matter of law to the contrary.[1]

Furthermore, the judge found "that the surrender of . . . [the] child . . . who was then less than one year old, was in direct violation of G. L. c. 210, § 2, and therefore void." The court passes over this finding because that particular child has died. I respectfully suggest that the death of the child does not efface the fact that the Society's agents employed an illegal procedure to procure her adoption. This fact in the light of other circumstances might well, in the mind of the judge, have tended to color their whole course of action.

Apart from, and potentially more significant than, our serious differences over the particular factual situation and the disregard of the judge's findings is the mistake which I think the majority makes in now establishing a test to determine the volitional and rational nature of the surrenders. I do not understand and the court offers no reason why (a) the norm applied in *commercial* transactions when duress and mental capacity are in issue,[2] or (b) the concept defined and applied in the testamentary disposition of *prop-*

---

[1] It seems quite clear to me that the burden of proof as to the voluntary nature of the surrenders, where challenged, falls upon and remains with the Society in this proceeding. This being so, the majority opinion presents the truly extraordinary situation where, on an issue of fact controverted mainly by oral evidence which is not reported, an appellate court rules as a matter of law that the burden of proof has been sustained — and this in the face of a finding to the contrary by the judge who saw and heard the witnesses and sensed the atmosphere in which the transaction was accomplished.

[2] The solicitude shown by the court to the parties in the commercial transaction involved in *Governor Apartments, Inc.* v. *Carney,* 342 Mass. 351, 354–355, presents an interesting contrast to that shown in the present case.

*erty* where undue influence is in issue (and where the safeguards of the Statute of Wills attend the execution of the document), should be selected as singularly suitable standards to measure the validity of surrenders of children for adoption. The rules in the cases cited by the majority in paragraphs 11, 12, and 13 of the opinion, while indisputably correct in context, have no special pertinency to the kind of proceeding before us. The majority states furthermore, "No statute has said that surrenders are valid only if executed free from [such] emotion, tensions, and pressures." By the same token, I submit, no statute has said that surrenders are to be held invalid only if executed in circumstances which are tantamount to insanity, fraud, undue influence or extortion as those terms have been specifically defined and applied. The obvious answer to both propositions seems to me to be that the Legislature was content to leave the decision to the judge, unfettered by a priori rules.

If, however, a standard must be established, at least as suitable a criterion as that proposed by the majority is one which embraces the principles observed and procedures followed in a preliminary hearing to determine the voluntary nature of a confession in a criminal case where we have always reposed great reliance upon the practical wisdom, prudence, and discretion of the trial judge who has observed the witnesses and heard the testimony. *Commonwealth* v. *Bond,* 170 Mass. 41, 44. *Commonwealth* v. *Makarewicz,* 333 Mass. 575, 585–587. See *Fikes* v. *Alabama,* 352 U. S. 191, 196–198; *Blackburn* v. *Alabama,* 361 U. S. 199, 205–211.

My own view is that we should not at this time prescribe any rigid standards for cases of the type before us. They are, for one thing, of rare occurrence. Furthermore, a case of this type as Chief Justice Rugg said in *Richards* v. *Forrest,* 278 Mass. 547, 556, "is especially adapted to determination by the wise judge experienced in settling the delicate problems arising in courts concerning domestic relations. Great weight must be given to the decision of the probate judge." Here the judge concluded that "to honor surrenders made under these circumstances would not tend to

the doing of justice and [I] declare them void." In this forthright and courageous statement based on the record I concur.[3]

Perhaps in an already lengthy dissent no useful purpose could be served by a discussion of certain minutiae of the opinion with which I likewise disagree. Nevertheless, I should like to make one more observation. The unnecessary involvement of the majority in a discussion of the welfare of the children and the rights of society beclouds the central issue which is simply the validity of the surrenders when executed. This central issue is quite unlike the issue involved in a case where a mother seeks the assent of the judge to a revocation of an admittedly valid surrender where a specific petition for adoption is in fact pending or has been allowed. In the latter type of case the welfare of the child is indeed of paramount importance. In the immediate issue before us it is completely irrelevant. The fact is that there is nothing which the Probate Court could allow the mother to withdraw or revoke *because there is no consent by the mother on its records.* Until action is taken to give the surrenders the effect of a stipulation of record by the mother, they should be considered ambulatory. See *Hurley* v. *St. Martin,* 283 Mass. 415, 417 (*authenticated court record* from Maine reciting agreement for adoption); *Wyness* v. *Crowley,* 292 Mass. 461, 464 (*"when the consent receives the sanction of the court"* [emphasis supplied]); *Kalika* v. *Munro,* 323 Mass. 542, 543 (*"consent, once made a part of the record,* binds him until . . ." [emphasis supplied]).[4] If, in fact, the mother had filed a petition for assent to revocation, the Society could argue that it was an implied admission that her surrenders were originally valid. Far from permitting such an inference, the mother by letter to the Society of April 26, 1960, after a *two months'* sen-

---

[3] I find it incongruous that the majority is willing to "assume" that the District Court judge in the proceedings under G. L. c. 119 made the necessary findings to support his order (par. 3 of majority opinion) but decline to accord similar weight to the decree of the Probate Court judge in this proceeding.

[4] The highest status attained by these instruments of surrender, which in my opinion remain ambulatory until made a part of the record of the Probate Court, was that of a disputed document introduced as an exhibit.

tence was imposed, renounced the surrenders; and, when on June 1, 1960, the Society took the initiative by filing the instant petition *"independent of a petition for adoption,"* she promptly joined issue on the question of the validity of the surrenders. The judge himself never purported to consider revocation or withdrawal of consent. Here he was asked by the Society, in effect, to give his sanction to the surrenders. He has refused to do it. He has found that the surrenders were never valid. It is on that finding that the decree was entered, and it is because of the rejection of that finding by the majority that I dissent and stand foursquare with the judge.

In all candor and with utmost respect for the majority, it appears to me that the court has set at naught a proper disposition of the case by the judge and has chosen to follow, almost to the letter, the recommendation made by the Society's social worker in the report dated April 1, 1960 (which is quoted in part in the opinion). In accomplishing this, the majority has departed from the procedure prescribed by statute and from the law as hitherto expounded by the court.