287 A.2d 115.

IN RE ADOPTION OF A MINOR CHILD.

FEBRUARY 10, 1972.

PRESENT: Roberts, C. J., Paolino, Powers, Joslin and Kelleher, JJ.

444

KELLEHER, J. This is an appeal from a decree of the Family Court vacating an earlier decree of that court which had granted the appellants' petition for the adoption of a

baby boy. We will, because our desire that the anonymity of the litigants and of the infant be maintained, describe the characters in this human drama by names other than their true names.[1] We shall call the boy "John," his natural mother "Ann" and the adopting couple as "James" and "Kathy."

Kathy and Ann are sisters. They were born and raised in Oklahoma. They share the same birthday, April 23. Kathy was born on April 23, 1943, while her sister Ann was born four years later on April 23, 1947. James is a native of Fall River. He married Kathy when he was a member of the Air Force stationed in Oklahoma. The marriage took place in Oklahoma on February 24, 1963. After being discharged from the Air Force, James and his wife moved east and eventually settled in the southeastern section of Rhode Island. No children have been born of this marriage. The couple reside in a six-room mobile home which is described by the Child Welfare Services Division of the Rhode Island Department of Social Welfare as a "neat" and "attractive" home.

Ann is single. At the time this present controversy had its inception, she was 22 years old. She lives in Oklahoma City, works in a local bank, and shares an apartment with one or two other girls. Her parents live on a farm in a town some 160 miles away. There are nine children in Ann and Kathy's family. We are unable to ascertain from the record how many of the children have remained on the farm.

In February 1970, Ann discovered that she was seven months pregnant. She spoke to the putative father. He expressed no interest in marrying Ann because as she said, "he didn't want the responsibility of a child." Instead, she telephoned her sister Kathy and it was agreed that she

---

[1] General Laws 1956 (1969 Reenactment) §8-10-21 by its reference to §14-1-5 has given the cloak of confidentiality to the records of hearings held on any adoption petition filed in the Family Court.

would come to Rhode Island where she would live with Kathy and James as she awaited the delivery date.

Ann apparently felt some obligation to her employer. She gave her termination notice but worked for an additional two-week period. She flew to Rhode Island, arriving here on February 24, 1970. In the ensuing weeks, Kathy took Ann to a gynecologist who practices in Fall River. Later, Ann, Kathy and James went to a Fall River attorney to make arrangements whereby the Rhode Island couple could adopt the baby. John arrived on April 13, 1970. The birth took place in a Fall River hospital. Ann gave her written consent to the proposed adoption two days later. It appears on the first page of a two-page form printed and provided through the Family Court Clerk's office. Three-fourths of the first page is reserved for the adoption petition. The bottom quarter of the page is so designed that the natural parent or parents, or a child of the age of fourteen or upwards[2] can, by affixing their signature, signify their consent to the adoption. The second page is entitled "Decree." It contains various printed findings and a space for any additional findings that might be made.

After being discharged from the hospital, Ann returned to the mobile home where she stayed for another six days. She then flew back to Oklahoma City, resumed her apartment residence and a week later, she returned to work. Ann paid her eastward flight fare. Kathy paid for the westward flight.

The adoption document was filed in the Family Court on April 24, 1970. An investigation was made by the Child Welfare Services Division. The division, in recommending that the petition be granted, pointed out to the court that the child had not resided with the adoptive parents for the six-month period described in G. L. 1956 (1969 Reenact-

---

[2]See §15-7-5.

ment) §15-7-12. The report informed the court that the division had been unsuccessful in its efforts to contact the natural mother. The adoption petition was granted on September 22, 1970. On October 26, 1970, Ann filed a motion to vacate the September decree and sought a writ of habeas corpus. A hearing was held, a decision rendered, and a decree entered. The decree "set aside" the adoption decree and ordered the return of the child. It also contained two findings: (1) the filing of the report was premature in that Child Welfare Services was duty bound to wait the full six months before filing its report; and (2) Ann, at the time she consented to the adoption, was "easily, unduly influenced" by her sister. We think otherwise as to both findings.

### The Report

Section 15-7-12 first provides that no adoption petition shall be granted until the child has lived in the adoptive parents' home for a period of six months but then goes on to state that the residency requirement may be waived by the trial judge upon a showing of good cause when satisfied that the proposed home and the child are suited to each other. This section in no way applies to the reports required of the state agency. Section 15-7-11 requires Child Welfare Services to verify the allegations of the petition and investigate the suitability of the new home and file a full report concerning its investigation with the Family Court. The statute states that the report is to be filed within 60 days after the division has been notified by the court of the pendency of the adoption petition. The instant petition was filed on April 24, 1970. It was referred to Child Welfare Services on April 27, 1970. The 60 days then began to run. The record shows that the agency's report was long overdue. It was not filed until a little over four months after the adoption petition had been filed in the court. We therefore hold that the Child Welfare Services was under

no. obligation to wait until the child was in his adoptive home for six months before it made its report to the Family Court.

In his review of the evidence on this phase of the case, the trial justice in his decision observes that Ann testified that she was under the impression from the inquiry sent to her by the state agency that the petition would not be heard until such time as she had forwarded her reply. The record does not support this assertion. Ann admitted that she received a letter in early August 1970 from the agency informing her that although she had given her written consent to John's adoption by Kathy and James, the agency wanted to make sure that she understood that the adoption would terminate all her maternal rights. The agency asked Ann to write explaining why she felt the adoption was in the best interest of herself and the infant. Ann was informed that once her reply was received, the agency's report would be supplied to the court.

Nowhere in the transcript is there any statement by Ann that she felt that the petition would be held in abeyance until she made a reply. Rather, she testified that after receiving the agency's communication (this was the second inquiry made of Ann by Child Welfare Services) she met with her boyfriend, John's natural father, and both read the letter "to see if we had made a mistake." This meeting apparently occurred in early August 1970. She said she wrote several replies but tore them up. Finally, on September 20 or 22, she consulted an Oklahoma attorney.

There is absolutely no reason to fault the action taken by Child Welfare Services. It waited a reasonable time for a reply from the second of two inquiries asked of Ann. There was no need to wait forever. Ann's reply was not forthcoming. The report mandated by the statute was due in court. The division did all that could be expected of it.

## The Nullification
## of the
## Adoption Decree

The September 22, 1970 decree of the Family Court which granted Kathy and James' petition for adoption amounts to a final decree. As such, it is subject to the provisions of §9-21-2, which in pertinent part provides as follows:

> "On motion and upon such terms as are just, a court may relieve a party or his legal representative from a final judgment, order, decree, or proceeding entered therein for the following reasons: (1) mistake, inadvertence, surprise, or excusable neglect; * * * (4) the judgment is void * * * or (6) any other reason justifying relief from the operation of the judgment. The motion shall be made within a reasonable time and not more than one (1) year after the judgment, order, or proceeding was entered or taken."

Ann's original motion to vacate the decree was based on allegations of a lack of jurisdiction of the Family Court to grant the adoption petition and an invalid consent obtained by reasons of undue influence and coercion. When the testimony in support of this motion had been concluded, Ann filed a second motion to vacate. It employed the blunder-buss technique. It asked that relief be granted upon the grounds that the decree had been entered as the result of "mistake, inadvertence, surprise or the excusable neglect on the part of" Ann. Since the trial justice's affirmative action was based on a specific finding of Kathy's "undue influence," we shall discuss this issue first and then such other facets of this case as merit any consideration.

While the adoption decree is subject to the provisions of §9-21-2, such a decree must be looked at in a different light than most other judgments. Once an adoption decree

is entered,[3] it brings about a myriad of changes affecting the entire fabric of our society. A decree of adoption performs a very vital, legal and sociological function.[4] Let us look at the parties in this case. The decree has removed the stigma of illegitimacy from John. He now bears the name of his adoptive parents. Because of the provisions of §15-7-16, John is deemed to be an heir of Kathy and James just as if he were their natural child. The family unit has been formed. Kathy and James have voluntarily assumed the duty to support and provide for John until he reaches his majority. This duty carries a price tag running into thousands of dollars. They have demonstrated an ability to care for their charge. Ann, by living with her decision, can make a proper social adjustment. A liberal attitude towards revocation of consent by a natural parent after entry

---

[3]It should be kept in mind that the case at bar does not involve an attempt at revocation of consent prior to the adoption. That particular issue has been treated differently by various state courts and legislatures. Several jurisdictions give the parent the right to revoke consent anytime prior to the final adoption decree. Other jurisdictions hold that the consent once given is irrevocable absent fraud or duress. The majority of jurisdictions vest the right to revoke within the discretion of the court. For a compilation of cases offering these three different views, see *People ex rel. Scarpetta v. Spence-Chapin Adoption Service,* 28 N. Y.2d 185, 269 N. E.2d 787 (1971). This court has not as yet been required to take a position on this question. Our adoption statute is silent on the matter of revocation. The denial of the petition for adoption in *Sklaroff v. Stevens,* 84 R. I. 1, 120 A.2d 694 (1956), rested on the grounds that, while the petitioners had the written consent of the child's natural mother, her subsequent marriage to the child's father prior to entry of the adoption decree deprived the Superior Court of jurisdiction to grant the petition because the father had not given his consent. The case at bar, unlike the *Scarpetta* case, involves the undoing of an adoption and the surrender of the child. For an overall view of judicial opinion where an attempt is being made to set aside the adoption decree, see 2 A.L.R.2d 887 and its later case service.

[4]In its 1971 legislative session, the General Assembly recognized the importance and worth of the adoptive process when it enacted P. L. 1971, ch. 88. This legislation provided for a system of subsidy payments by the state to parents who adopt handicapped or hard-to-place children.

of an adoption decree can engender a sense of insecurity on the part of the adoptive parents which in turn can have severe psychological repercussions on the one whose interest falls to the protection of the court, that is, the child. An adoption proceeding is a tripartite affair. There are three parties concerned with each adoption petition: the natural parents, the adoptive parents and the child. We think that the physical welfare and emotional stability of all three require that there be some assurance as to the finality of an adoption decree. It is especially important that persons who adopt minor children may rely on the decree as some guarantee that, in addition to the child, they are not also adopting at some future time litigation whose goal is to extinguish the parent-child relationship and force the adoptive parents to relinquish the child upon whom they have showered care and affection. The natural parent should be saved the stress and strain involved in futile attempts to regain custody of the child. The one seeking to annul an adoption decree should carry a heavy burden.

This court has in the past recognized the gravity of the situation in adoption proceedings where there has been an attempt at the involuntary severance of the parental ties between a mother and child. In *Gillis* v. *Main*, 96 R. I. 88, 189 A.2d 808 (1963), we ruled that a petition for adoption sought without a parent's consent could not be granted unless there was a showing by "clear and convincing" evidence that a mother had willfully deserted her child. We think the same burden should devolve upon a parent who, after having consented to an adoption and a decree having been entered, thereafter seeks to vacate the final decree of adoption. Unless this qualitative standard of proof is met, an adoption decree should not be set aside. *In re List's Adoption*, 418 Pa. 503, 211 A.2d 870 (1965).

We are well aware of our long-standing rule that findings of fact made by a trial judge in a nonjury case are entitled

to great weight and a decision based thereon will not be disturbed unless clearly wrong. Nevertheless, this proposition is subject to the qualification that such deference is not due when the trial justice has misconceived or overlooked material evidence.

The trial justice observed that Ann was in such an emotional state at the time she gave her written consent that she was easily subjected to Kathy's "undue influence." At no time did he ever specifically define this term. This court has, when determining the validity of one's last will and testament, defined undue influence as the substitution of the will of another for the free will and desire of the testator. *Brousseau* v. *Messier,* 79 R. I. 106, 84 A.2d 608 (1951); *Talbot* v. *Bridges,* 54 R. I. 337, 173 A. 72 (1934). A finding of undue influence is warranted only when the evidence shows that the influence has been exerted to such a degree as to amount to force or coercion so that the actor's free agency is destroyed. *Nalley* v. *Nalley,* 253 Md. 197, 251 A.2d 849 (1969).

The Massachusetts Supreme Judicial Court has stated that in determining presence of undue influence in adoption cases, it will apply the same criterion that it has employed when the validity of a will is being questioned. *In re Surrender of Minor Children,* 344 Mass. 230, 181 N.E.2d 836 (1962). We shall do likewise.

The trial justice was confronted with two differing views as to what transpired when Ann gave her written consent to Kathy and James' petition. She testified that she was upset and crying and informed Kathy that she did not want to sign the consent portion of the adoption document or give the baby to Kathy. Ann stated that Kathy told her that the hospital would not permit her or the baby to leave the hospital until the bills were paid. She claimed that it was after this conversation that she agreed to sign the paper. Ann insisted that the persons whose signatures ap-

pear on the document as witnesses to her consent were not present at the time she signed the paper. The adoptive parents and the two witnesses testified that they were all present when Ann gave her written consent. Kathy categorically denied that she made any statement relative to Ann's and the baby's inability to leave the hospital. Kathy did inform the court that she had a conversation with her sister wherein she told Ann that the hospital bills would be paid by the adoptive parents. When Ann left the hospital, she returned to the mobile home where she stayed another six days. It is uncontradicted that Kathy's husband asked Ann at least once on each of the six days whether she wanted to proceed with the adoption and received an affirmative response each time.

It is conceded by all that Ann had read the adoption petition prior to giving her written consent. During the six-day postnatal period Ann spent at the mobile home, she and Kathy observed their joint birthdays by participating in a party. There is no dispute that Kathy and James have discharged their parental duties to John in an admirable fashion. When Ann returned to Rhode Island for the hearing in her effort to vacate the adoption decree, she was accompanied by her parents. While they were here, all three stayed at Kathy and James' home.

In finding that Ann had involuntarily turned John over to Kathy and James, the trial justice pointed to Ann's version of what went on in the hospital. In doing so, we believe that he has overlooked a most pertinent piece of evidence. It is a letter written by Ann to her sister dated July 29, 1970, some three months before Ann came back to Rhode Island and testified in support of her motion to revoke the decree. In the letter, she acknowledged that on the previous evening she had talked on the telephone with Kathy. Kathy did testify that she had called Ann at the behest of the social worker who was making the pre-adop-

tion report to ask her sister to reply to the inquiry sent her by Child Welfare Services. This letter, in our opinion, is mute compelling evidence as to the true relationship that had existed between the sisters. In her letter, Ann told her sister that she was no longer dating John's natural father. She also expressed the wish to do something to the putative father so that "he could feel only apart [*sic*] of what *we* all went through." (emphasis ours) She declared that she had thought of putting sugar in his gas tank but did not feel that such punishment was sufficient. She expressed appreciation for the baby pictures and asked Kathy to send her the negatives. Ann asked Kathy to take a trip to Oklahoma and bring James and John along. Ann concluded her letter by telling Kathy how fortunate she was to have such a wonderful husband as James. She also told of her desire to work at the bank and study at the local college. Her closing salutation was "Love ya all."

We believe that the sentiments in this July 1970 letter completely contradict and impeach Ann's in-court attempt to show that her sister had forced her to sign the consent. It is obvious that Ann is a reasonably intelligent person. The sentiments in the letter written at a time when litigation was unthought of are entirely at odds with the sentiments of one who at the revocation hearing sought to paint a picture of having been coerced into consenting to the adoption. They are also most inconsistent with Ann's testimony that she kept calling Kathy and telling her that she wanted the infant returned to her. The evidence she has adduced on this issue, when viewed in its totality, does not meet the requisite standard of proof.

An adequate reply to the trial justice's observation as to Ann's emotional state can be found in the following excerpt from *In re Surrender of Minor Children, supra* at 236, 181 N.E.2d at 839:

"Contemplation of the surrender of one's own child is in many, if not all, cases a cause of emotional and mental stress. Many such surrenders are undoubtedly by mothers of children born out of wedlock and are contemplated because the trying circumstances tend to show that the welfare of the child calls for action at variance with that dictated by natural instincts of maternal love and affection. No statute has said that surrenders are valid only if executed free from emotion, tensions, and pressures caused by the situation. No principle of law requires the rule. A balance of the interests of the persons concerned and of society weighs strongly against it."

In her brief, Ann argues that the court was powerless to enter the adoption decree because John had not lived with the adoptive parents for the six-month period contained in §15-7-12. The obvious answer to this is that the statute permits the trial justice to shorten this period upon a showing of cause. This interval between placement and adoption is not supplied for the benefit of the natural mother so that she use this period as time during which she can experience a change of heart. Rather, the Legislature set aside this period as a time in which the child and the adoptive parents can become acclimated to one another. Implicit in the trial justice's grant of the petition was his belief that compatibility reigned between Kathy, James and John and there was no need to wait any longer.

Ann, in seeking to uphold the setting aside of the adoption decree, directs our attention to §15-7-14 and then points to the absence in the decree of a specific finding relative to the six-month placement period. In essence, §15-7-14 states that if after consideration of the investigative report and a hearing the trial justice is satisfied as to the identity and relations of the persons, and that the petitioning parties have the requisite ability to bring up the child and provide for his sustenance and education and that it is fit and proper that the adoption should take place, a decree shall be made

setting forth the facts together with a declaration that thereafter the child shall to all legal intents and purposes, be the child of the petitioning parties. There is absolutely nothing jurisdictional about the obligations set forth in this statute. It does not require that the trial justice specifically state that he is waiving the six-month placement period. There is in the decree a specific finding that the proposed home and the child are suited to each other. This finding warrants a conclusion that the trial justice, after reviewing the report, the allegations in the petition and the birth and marriage certificates, saw no necessity for any further delay before he granted the petition whereby John became the son of his maternal aunt and her husband. The view espoused by Ann is neither realistic nor justified. We must acknowledge that the decree contains a finding that John has resided with his new parents for a period of six months. This is in light of the record a patent error. It is just surplusage. While the decree is inartistically drawn, Ann's hyper-technical reasoning finds no support in law or reason.

We cannot fault the conduct of Kathy. In his decision, the trial justice commented adversely on Kathy's frank admission that sometime prior to the September hearing, Ann had called her and said she was "thinking" of changing her mind about the adoption. The court stated that this showed that in early September 1970 Ann had formed the intention to withdraw her consent. We cannot agree with this observation. Ann's statement to her sister is as ambivalent as her off-again on-again attitude towards John's natural father. In July, she was thinking of sugaring his gas tank. Later on in the summer, she was going to confer with the father relative to the Child Welfare Services inquiry to see whether they themselves had made a mistake.

Finally, we do not believe that Ann was entitled to any notice as to the hearing date of the adoption petition. In

taking this position we are aware of the holding in *Armstrong* v. *Manzo*, 380 U. S. 545, 85 S.Ct. 1187, 14 L.Ed.2d 62 (1965). The *Armstrong* case concerned an adoption petition which sought an involuntary termination of the father's right to consent because of his alleged failure to support the child. The Supreme Court held that due process required that the father be given notice of the adoption hearing so that he be offered an opportunity to counter the nonsupport allegation. The situation before us is factually inapposite to the *Armstrong* case because Ann has given her consent to the grant of the adoption petition. Notice[5] is required only where consent is lacking. It affords the nonconsenting parent an opportunity to contest the grant of the petition. Consent takes the place of notice. Ann, by giving her voluntary consent to the grant of the petition, has waived any right to notice of its pendency and consideration. *Stewart* v. *Rouse*, Tex. Civ. App. 469 S.W.2d 615 (1971); *Smith* v. *Welfare Department*, 144 Colo. 103, 355 P.2d 317 (1960); Clark, *The Law of Domestic Relations* §18.2 at 613 (1968).

The adoptive parents' appeal is sustained. The decree appealed from is vacated and the case is remanded to the Family Court with a direction that it dismiss the petition and the motions filed by the natural mother.

---

[5]Our adoption statute specifically provides for notice to the natural parents or parent where there is a voluntary or involuntary termination of parental rights pursuant to the terms of §§15-7-6 and 15-7-7. A close reading of §15-7-8 shows that a parent whose parental rights are being terminated pursuant to §15-7-7 on such grounds as imprisonment for three or more years, desertion or neglect to provide for the child for the one-year period immediately prior to the filing of the termination petition and written consent to the adoption petition has been obtained, is not entitled to any notice. There is also a provision for constructive notice to the parents whose whereabouts are unknown. §15-7-9. There is no statutory requirement for notice in circumstances such as presented in this case.

*Abedon, Michaelson, Stanzler & Biener,.Milton Stanzler,* for appellee.

*Gladstone & Zarlenga, B. Lucius Zarlenga,* for appellants.