SURRENDER OF A MINOR CHILD.

Essex.    January 16, 1973. — April 30, 1973.

Present: ROSE, GOODMAN, & ARMSTRONG, JJ.

*Parent and Child. Adoption. Minor. Undue Influence. Probate Court,* Judicial discretion.    *Evidence,* Relevancy and materiality.

On a petition by a mother about eighteen years of age seeking permission to withdraw her consent to the surrender of her illegitimate child to a charitable organization for the purpose of adoption, a finding by the probate judge that the surrender agreement "was executed voluntarily and was made with the full understanding of every fact necessary to the petitioner's consent" was warranted by evidence that she had seven meetings with the organization's social worker, that the petitioner received clear explanations of the alternatives open to her, that on several occasions she repeated a desire to have the child placed in a permanent home for adoption, and that soon after the child was born the petitioner voluntarily went with her mother to the organization's office, again indicated the petitioner's desire, and read and was read the surrender agreement and signed and acknowledged it [258-260]; and the judge was justified as a matter of discretion in denying the petition [263].
At the hearing of a petition by a mother seeking permission to withdraw her consent to the surrender to a charitable organization of her illegitimate child, who was placed with prospective adoptive parents soon after his birth, evidence, particularly the evaluations and conclusions of a psychiatrist and of the organization's social worker

---

after each had observed the child in the home of such parents, amply warranted findings by the probate judge that "the removal of the child from the home of the prospective adoptive parents . . . would not confer any significant benefit on him," that . . . "such a removal . . . would affect him adversely," and that his best interests would not be served by removal. [260-265]

At the hearing of a petition by a mother seeking permission to withdraw her consent to the surrender to a charitable organization of her illegitimate child, who was placed with prospective adoptive parents soon after his birth, testimony of a psychiatrist as to the child's health and his relationship with such parents, and testimony of the organization's social worker as to her investigation of such parents, were pertinent and admissible on the paramount issue of the welfare of the child. [264]

PETITION filed in the Probate Court for the county of Essex on August 14, 1970.

The case was heard by *Keedy, J.*

*John F. Lombard* (*E. Seavey Bowdoin* with him) for the petitioner.

*Robert W. Welch* (*William B. Welch* with him) for the Catholic Charitable Bureau of Boston, Inc.

ROSE, J. The petitioner, mother of an illegitimate child, seeks permission to withdraw her consent given on November 14, 1969, for the surrender and adoption of the child to the Catholic Charitable Bureau of Boston, Inc. [the Bureau] through its Salem office, the North Shore Catholic Charities Centre. Her petition was filed on August 14, 1970, and was followed on August 20, 1970, by the filing of a petition for guardianship wherein she sought to have herself or some other suitable person appointed as guardian of the child. On the following day she filed another petition in equity seeking to enjoin the Bureau, the North Shore Catholic Charities Centre, and its Director, Reverend John B. McCormack, from filing or proceeding with a petition for adoption of the child. After hearing, all three petitions were dismissed by the probate judge on August 5, 1971. The petitioner appeals only from the decree dismissing the petition to withdraw her consent to the surrender of the child. The probate judge filed a report of material facts and the evidence is reported.

On July 28, 1969, the petitioner, unmarried and five months pregnant, went with her parents to the respondent's North Shore office in Salem. There they met with one Muriel Michaud, a social worker employed by the respondent. All subsequent meetings and conversations were with Miss Michaud. At the second meeting the petitioner was accompanied by her mother. These first two meetings dealt with maternity planning and they discussed the alternatives open to the petitioner as follows: She could remain at home; she could go with a recently married sister and her husband in Salem; or she could go into one of the respondent's maternity homes. Inasmuch as the petitioner's father did not want to have her remain at home nor would he pay the $40 weekly required for maternity home care and she did not have funds of her own, she decided to live with her sister and brother-in-law until her confinement.

Thereafter, the petitioner, by herself, met with Miss Michaud several times prior to the birth of the child on November 6, 1969. She was then eighteen years of age. They discussed the alternatives available to the petitioner. She was advised she could keep the child with her or the child could be placed in a foster home provided by the respondent at a cost of $15 per week or the child could be placed in a temporary foster home preliminary to adoption. The petitioner indicated to Miss Michaud that because her father did not want her and the baby to remain at home, living space was inadequate at her sister's home, and the petitioner was without funds or a job to meet the $15 weekly charges for foster home care, therefore she wanted the child in a permanent home as soon as possible. Consequently, she had tentatively decided on the plan which called for placing the child in a temporary foster home until she signed the final release for adoption. Miss Michaud explained to the petitioner that under the Bureau's practice "she could not sign the final release for adoption until she left the hospital after confinement and was back on her feet."

The probate judge concluded in his report of material facts that "Miss Michaud fully and carefully explained to the petitioner, and the petitioner fully understood the difference between — 1. Care in a foster home which arrangement could be terminated at the petitioner's request — and 2. Care in a temporary foster home followed by a surrender for adoption which was permanent."

On November 7, 1969, the day after the child was born, Miss Michaud visited the petitioner at the Salem Hospital and inquired if her plan for adoption remained the same. The petitioner told her that her plans had not changed. Miss Michaud then submitted to the petitioner for her signature a paper authorizing care in a temporary foster home and another paper granting authority to provide medical care to the child if it was needed. She told the petitioner to call her office "when she was out of the hospital and back on her feet and ready to make the final decision with reference to the child."

On November 10, 1969, the petitioner left the hospital and she has not seen the child since that time. The next day the child was placed in a temporary foster home by an agent of the respondent. On November 26, 1969, the child was placed with the prospective adoptive parents, where he has since remained.

The petitioner called the respondent's office and arranged an appointment for November 14, 1969. At that conference she spoke alone with Miss Michaud and asserted that her plan to surrender the child for adoption remained the same. The petitioner and Miss Michaud then joined the petitioner's mother, and Miss Michaud told the mother that the petitioner "feels that she is ready to sign final adoption papers." Miss Michaud took the original agreement of surrender for adoption, handed the petitioner a copy of the same and asked the petitioner to read the copy to herself as she, Miss Michaud, read the original out loud. This was done by the petitioner, and at the conclusion of the reading by Miss Michaud, the petitioner signed the original agreement in the presence of her mother, who in turn signed as a witness, and the petitioner acknowledged

the agreement before Miss Michaud, a notary public.

The probate judge in his report of material facts stated that "On the day the petitioner signed the instrument of surrender, she was nervous and upset. There was no lawyer present and at no time did she have the advice of counsel with reference to the surrender of her child prior to signing the written instrument."

On January 20, 1970, the petitioner moved to Springfield, obtained employment and within a few days met the young man to whom she is now married. Shortly before her marriage on March 20, 1970, a Springfield attorney, acting in her behalf, requested that the respondent return the child to the petitioner. The Bureau, through Reverend John B. McCormack, its director, after reviewing the case decided not to return the child. The instant petition was filed thereafter on August 14, 1970.

If the child is returned, the petitioner and her husband plan to adopt him as soon as possible. The court found their marriage stable and happy, their apartment ample, the petitioner's husband with "a good position" and able to support the family adequately. The family now includes a child born to them in March, 1971.

The prospective adoptive parents and their home were investigated by Miss Michaud for the respondent. The probate judge found them to be "people of good character and standing in their community. They have a happy, stable marriage of nearly ten years duration." The husband's income is sufficient to support the family. Miss Michaud has visited the home twelve to fifteen times and has observed the child who has had a normal growth, is healthy, secure, outgoing and well-adjusted to his environment. There are strong bonds of love and affection between the child and the prospective adoptive parents, and in her opinion the removal of the child would have an adverse affect on him. Dr. Tobias Friedman, a psychiatrist, and Psychiatric Director of the North Shore Guidance Center for Children, visited the home twice, observed the prospective adoptive parents and the child and concurred in the evaluation of the relationship and the development of the

child. He also concluded that the removal of the child from the home would affect him adversely.

The petitioner's principal position is that she did not "voluntarily sign the surrender agreement with full understanding as to the legal effect of this act." She contends that her young age, as well as parental and financial pressures, and the absence of advice of an attorney, or any other independent source created such emotional stress that she could not exercise free and independent judgment.

We concur in the findings of the probate judge, who in his report of material facts stated, "The written instrument surrendering the child to the respondent for placement for adoption was executed voluntarily and was made with the full understanding of every fact necessary to the petitioner's consent." The evidence clearly warranted this conclusion. The petitioner had the benefit of seven meetings with Miss Michaud over a period of time, some of them with her parents present. The options open to her, including retention of the child, were clearly explained under circumstances free of pressure or coercion. On several occasions she repeated her desire to place the child in a permanent home for adoption. She was asked by Miss Michaud to reserve her decision on this matter until she left the hospital and "was back on her feet." She came to the Bureau voluntarily with her mother and again indicated her decision to have the child placed for adoption. The surrender document was read to her and she followed the reading with a copy in her hands. We are unable to perceive in these circumstances any supporting evidence of a mind dominated by another or under such strain that free will was repressed. The decisive issue in this appeal is whether the mother's assent was voluntary and with the requisite "full understanding." *Surrender of Minor Children,* 344 Mass. 230, 234.

There is no finding, or basis for a finding, of undue influence. It was the duty of the Bureau, through its agent, Miss Michaud, to explain all of the alternatives available to her. This it did with full understanding of the difficult circumstances facing the petitioner and the impact on her.

We have no basis to infer from the evidence that the Bureau went beyond its duty and attempted to influence her course of action. The same requisites for determining undue influence in procuring another to make a will apply in adoption proceedings. *Phillips* v. *Chase,* 203 Mass. 556, 560. "It is established that that means that the person exercising the influence so far dominated the will of the other person as to substitute his will for that of the other person with the result that the action brought about by the undue influence is not in reality the act of the person whose act it is in form, but the act of the person exercising the undue influence." *Phillips* v. *Chase, supra,* at 560.

Nor is there any evidence of duress or coercion. There is no finding, or basis for a finding, that the Bureau did anything to overcome the petitioner's will and compel assent "and which had that effect." *Surrender of Minor Children,* 344 Mass. 230, 235. *Freeman* v. *Teeling,* 290 Mass. 93, 94-95.

It is understandable that this was a deeply emotional and stressful experience for the petitioner. However, as was said in *Surrender of Minor Children, supra,* at 236, which presented a factual situation where the mother appeared to be less capable of comprehending her actions, "Contemplation of the surrender of one's own child is in many, if not all, cases a cause of emotional and mental stress. Many such surrenders are undoubtedly by mothers of children born out of wedlock and are contemplated because the trying circumstances tend to show that the welfare of the child calls for action at variance with that dictated by natural instincts of maternal love and affection. No statute has said that surrenders are valid only if executed free of emotion, tensions, and pressures caused by the situation. No principle of law requires the rule. A balance of the interests of the persons concerned and of society weighs strongly against it."

The rule has been established that the voluntary assent to an adoption if given with a full understanding of every fact necessary to consent may be withdrawn only with the consent of the probate judge. *Kalika* v. *Munro,* 323 Mass.

542. *Ellis* v. *McCoy,* 332 Mass. 254, 258. *Adoption of a Minor,* 338 Mass. 635, 642, 643. *Surrender of Minor Children, supra,* at 234. In the latter case, the court said at p. 234, "The judge in granting or withholding assent is to be guided by the established principles governing the disposition of petitions for adoptions, the most fundamental of which is that the paramount issue is the welfare of the child." *Erickson* v. *Raspperry,* 320 Mass. 333, 335. See *Richards* v. *Forrest,* 278 Mass. 547, 553-555.

The petitioner relies extensively on *Ellis* v. *McCoy, supra,* as authority for the power of the probate court to allow a motion by the natural mother of the child for leave to withdraw and revoke her written consent to adoption even though her consent has been given voluntarily with full knowledge of its consequences. But in that case at p. 258, the court said, "It is also our opinion that the findings are sufficient to justify its allowance *as matter of discretion*" (emphasis supplied). In the instant case, the judge, having found the consent to adoption to have been given voluntarily with full knowledge of its consequences, was justified as a matter of discretion in denying the petition for permission to withdraw the same.

The petitioner urges this court to hold that the probate judge, who was in a position to evaluate the credibility and the demeanor of the witnesses, was plainly wrong in his findings. This we decline to do. The evidence and the permissible inferences which may be drawn therefrom lead to the irresistible conclusion that not only was the judge not plainly wrong but that his findings and conclusions were more than amply warranted. This includes the judge's finding that "[t]he removal of the child from the home of the prospective adoptive parents where he is happy, healthy, secure, and well-adjusted, and where he has been practically all of his life, would not confer any significant benefit on him. On the contrary, I find that such a removal from the home where he has strong bonds of love and affection would affect him adversely." We believe that the evaluations and conclusions of Dr. Friedman and Miss Michaud, after each had observed the child in his present

home, are most persuasive, and thus we agree with the probate judge that the child's best interests would not be served if he were removed. "When a child is placed by its parent for adoption in a good family the inevitable consequence will be that firm bonds of affection and confidence will rapidly arise on both sides. The damage to the child, who cannot understand what is happening, from breaking these bonds is something which even competent psychiatrists may be unable to predict. In the absence of compelling statutory command, such a breach should not be permitted lightly at the request of either of the natural parents who had their chance to take care of the child themselves and who themselves have created the unfortunate situation. The interests of the natural parents in such a case must be completely subordinated to the paramount interest of the child." *Adoption of a Minor,* 338 Mass. 635, 643.

The petitioner raises objection to the allowance of the testimony of Dr. Friedman, the psychiatrist, relative to the child's health and his relationship with the prospective adoptive parents with whom he was placed, and to the testimony of Miss Michaud pertaining to an investigation made by her of these people. It is claimed that this testimony is irrelevant in a petition for permission to withdraw consent to adoption. As was indicated earlier in this opinion, the withholding of assent by the probate judge is to be guided by the paramount issue of the welfare of the child, *Surrender of Minor Children,* 344 Mass. 230, 234, and cases cited. The evidence thus introduced had pertinent bearing on this issue and its admission was proper.

*Decree affirmed.*