589 P.2d 957

In the Matter of Christopher Robert ANDERSEN, a minor child.

Robert R. ANDERSEN and Susan Kim Kerns Andersen, husband and wife, Petitioners-Respondents,

v.

Gordon K. CRAPO and Sherrian Crapo, husband and wife, Defendants-Appellants.

No. 12891.

Supreme Court of Idaho.

Dec. 6, 1978.

Rehearing Denied Feb. 16, 1979.

Reginald R. Reeves, of Denman, Reeves & Ohman, Idaho Falls, for appellants.

Jerry K. Woolf, of Fanning & Woolf, Idaho Falls, for respondents.

BISTLINE, Justice.

The controversy and resultant district court judgment which we review today centers around an infant boy whose parents under adverse conditions decided to give the baby—then 4 weeks old—for adoption, and then changed their minds shortly afterwards and prior to the institution of any adoption proceedings. The infant's parents, in placing him with the proposed adoptive parents, each signed a consent to adoption which was not filed with the adoption court until over 6 weeks later, and only after an attorney for the parents had notified the adopting parents that the consents were revoked.

In the adoption proceeding, the parents were not made a party thereto by any service of process upon them. In the petition for adoption, the adopting parents did not make any allegations which would have placed in issue the validity of the revocation. On habeas corpus review, the district court held that the consents could be revoked and here were revoked under circumstances that allowed of such revocation. A more detailed statement of the background of events leading to the giving of the consents, and then to their revocation, is in order.

Before doing so, however, we emphasize again that the natural parents were not named as parties to the adoption proceeding, and were not served with process. It is only by reason of the consents which each parent had executed that the adoptive parents can contend that the parents were in the eyes of the law "parties" to the adoption proceedings. This follows, as it must, (if there is to be a semblance of constitutional due process to such an adoption proceeding) from the statutory provision that the consent of the parents being filed in the court "shall be deemed a sufficient appearance." I.C. § 16–1506. In *Leonard v. Leonard*, 88 Idaho 485, 401 P.2d 541 (1965), it was held that "consent or its

procedural equivalent, notice, forms the basis of a proceeding for adoption . . . a jurisdictional fact and a condition precedent with which compliance is essential to full validity and effect of the decree." *Id.* at 495, 401 P.2d at 547. Notice is a fundamental element of due process, and parents are entitled to both notice *and an opportunity to be heard. Id.* at 495, 401 P.2d 541. Here, notwithstanding that the parents advised the adoptive parents that the consents were revoked, the parents were not given notice that the adoptive parents were proceeding to seek an adoption decree predicated upon those consents, and they were not afforded the opportunity to be heard in the adoption court on the issue of claimed revocation of those consents.

 In *Leonard*, the Court quoted, *inter alia*, the following passages from 1 Am. Jur. *Adoption of Children* § 44:

"The *object of notice* is not merely to bind those who have not consented and without whose consent the adoption cannot be made. It is more than this—it is to bind those who are entitled to be heard upon the question whether they have forfeited their rights in regard to consent, *and to prevent them, if notified, from again raising this question.* Although notice is not always specifically required, the judicial proceedings by which adoption is effected are prescribed as a duty of courts of record, wherefore it is presumed that the legislature intended that such proceedings should be in accordance with the usual practice of such courts, requiring notice as an element of due process."

*Id.* at 494, 401 P.2d at 547 (emphasis added). Our adoption statutes make no provision for serving of process on the parents of a child whose adoption is sought by others, and, if we are to uphold the validity of the procedures provided in those statutes—which we should strive to do—it is only by judicially recognizing that the legislature has constituted a valid and unrevoked consent as being all at the same time *a parental relinquishment, a general appearance,* and a *waiver of notice as well.* This the Court has heretofore done. Absent a general appearance, which a valid unrevoked consent is deemed to be, there must be notice by service of process, and an opportunity to be heard. While a valid unrevoked consent suffices to serve such requirements of due process, withdrawal of the consent, if such takes place, is equally a withdrawal of the consent's deemed legal effect as a general appearance and as a waiver of notice. While, as will appear hereinafter, there is throughout the states much case law, pro and con, and statutory provisions as well, governing revocation of consents insofar as they are parental relinquishments, there appears to be no case which holds that a waiver of notice cannot be withdrawn—not only in adoption proceedings but in any judicial proceeding. Nor does it appear that a written general appearance cannot be withdrawn prior to the filing of the action in which it is to be used. A purported revocation of consent, whether or not effective as a parental relinquishment appears to cancel at least the consent's legal effect as a deemed general appearance and as a deemed waiver of notice, thus requiring that the parental relinquishment issue be placed before the adoption court. Such a procedure is the only sound one to follow in order to gain a judicial determination on the issue of validity of revocation and thereby obtain an adoption decree with *res judicata* effect.

*HISTORY*: Sometime in 1976, petitioner-respondent Kim Andersen (Kim), at that time unwed, became pregnant by petitioner-respondent Robert R. Andersen. The two were married after the baby was born. During her pregnancy, Kim enlisted the aid of her aunt and of a social worker in locating prospective adopting parents. Appellants Gordon and Sherrian Crapo were interested in adopting the as yet unborn child, and Kim determined that the Crapos should be the adopting parents. However, when Kim went into labor she changed her mind and informed the Crapos that the baby would not be available for adoption.

Kim's baby was born on May 26, 1977. Approximately four weeks later, Kim once

again decided to let the Crapos adopt the baby and called them on June 23, 1977, to inform them of this decision. The next morning both Kim and Robert met the Crapos at a restaurant, the Crapos taking the baby. The parties then went before a notary public at a local bank where the signatures of both the Andersens and the Crapos were placed on consent to adoption forms which Kim had obtained from an attorney during her pregnancy.

The Andersens then left for California. Shortly after arriving there, the Andersens made two phone calls to the Crapos requesting that the baby be returned. The Crapos refused. The Andersens made a third phone call in which they apologized for their demands, stating that they would not attempt to regain custody. At this point, the Crapos obtained an unlisted number, and the Andersens were unable to make further phone contact.

The Andersens then retained a California attorney who, after pledging that he could get the baby back for a fee of $6,000, sent a letter to the Crapos on August 9, 1977, stating as follows:

It is my understanding that they [the Andersens] turned over custody of the minor child to you. There was never any formal court action or legal proceeding by which you became the legal guardian, custodian, or parents of said child. Therefore, you only hold the child at the consent of my clients, the legal parents. They have informed me that they have made demand on you for the return of their child, and you have refused to turn over the child to them.

Your withholding of the child has no legal basis, as it is against the consent of the parents. The natural parents are lawfully entitled to the child immediately. I am putting you on notice of the parents' action in this matter, as they would like me to make arrangements with you for the return of the child.

Upon receipt of this letter, the Crapos immediately contacted their own counsel who, on August 15, 1977, sent Andersen's attorney a letter narrating the history of the events to that date and stating:

Prior to departure, both she [Kim] and Mr. Andersen signed formal consents to adoption, before a notary.

. . . . .

A petition for adoption has been filed.

. . . . .

The Crapos have been appointed temporary guardians of the child.

The Crapos fully intend to fight any effort to interfere with their custody and adoption of this child.

The record shows, however, that although the petition for adoption was filed on August 12, 1977, the order granting temporary custody, *ex parte*, did not issue until August 16, the day *after* the letter was sent. The Crapos did not allege in their adoption proceeding that the revocation of consents was claimed by the Andersens, nor did they cause process to be served on Andersens.

The Andersens, unable to pay the California attorney's legal fee, sought other counsel there and were advised to retain Idaho counsel. This they did upon their return to Idaho in late September. According to the Andersens and their counsel, a diligent search on their part failed to unearth either the Crapos or the location of the adoption proceedings which, as mentioned above, had been underway since August 12, 1977. A final order of adoption issued on October 31, 1977. No appeal was taken from this order.

The Andersens filed a petition for a writ of habeas corpus on November 16, 1977, with the District Court of Bingham County. The writ was granted on the same day and served on the Crapos on December 1, 1977. A hearing was held on December 9, following which the trial court entered a final judgment on December 23 which set aside the adoption decree and required the return of the adopted child to the Andersens. The Crapos appeal from that judgment. Their motion to the trial court for a stay order was denied on March 14, 1978. We granted a stay of enforcement effective during the pendency of the appeal or until further order of this Court and set the cause for

oral argument in early June. Following oral argument additional briefing was submitted.

## I

■ Appellants Crapos argue at the outset that the trial court erred in not granting their motion to dismiss the writ of habeas corpus on the grounds that respondents Andersens failed to provide an answer to the return on the writ. They argue that without such an answer the return to the writ stands as the complaint and, since its allegations are deemed admitted, the writ must be dismissed. This ground was not stated in the motion to dismiss the writ nor was it argued below. Consequently, it cannot properly be raised on appeal. Moreover, the argument exalts form over substance since it is standard procedure to treat the petition itself as the answer to the return when the petition fully serves to traverse the allegations of the return and when no further affirmative pleading appears necessary. *Cole v. Cole,* 68 Idaho 561, 573, 201 P.2d 98, 106 (1948).

■ Appellants' more central argument with regard to the habeas corpus proceeding is that it functioned as a collateral attack on the adoption order. The Crapos argue that their attorney's letter of August 15, 1977, served as notice to the Andersens that a petition for adoption had been filed. They argue further that the Andersens' contention that they and their attorney were unable to locate the adoption proceedings is implausible in the extreme and cannot excuse their failure to intervene. Finally, Crapos urge that the Andersens failed to perfect a timely appeal and by the doctrine of *res judicata* are barred from bringing their habeas corpus petition.

The district court held that "the remedy of habeas corpus in the opinion of the Court is a proper remedy to reach the issues," namely, the question of "whether or not the natural parents had revoked their consent" to the adoption proceedings. In reaching this conclusion, the court analogized the habeas proceedings to a Rule 60(b)(3) motion for relief from judgment due to fraud,

misrepresentation or other misconduct of an adverse party. We cannot say that the district court erred in making this approach. As earlier pointed out, a consent serves not only as a relinquishment, but is deemed to also serve as a general appearance. In turn, a general appearance by consenting parents would constitute the consenting parents as parties to the action, and thereby accord them status to appeal and present post-judgment motions. Here, however, the Andersens did not perceive that they had appeared generally, having revoked the consents prior to the time the consents were filed in the adoption court. We are unable to see where the Crapos could complain had the Andersens sought relief by a Rule 60(b) motion, or where they can complain where relief was sought in a habeas corpus proceeding. In either event, the issue to be decided is identical, *i. e.,* did they have the right and cause to revoke their consents. The validity of an adoption decree has been many times tested by the collateral attack of a habeas corpus proceeding. *Finn v. Rees,* 65 Idaho 181, 141 P.2d 976 (1943); *Vaughn v. Hubbard,* 38 Idaho 451, 221 P. 1107 (1923); *Jain v. Priest,* 30 Idaho 273, 164 P. 364 (1917); *In re Martin,* 29 Idaho 716, 161 P. 573 (1916). *See In re Hendrickson,* 159 Mont. 217, 496 P.2d 1115 (1972); 2 Am.Jur.2d Adoption § 70. In 92 A.L.R.2d at 827, it is stated:

> In addition, a party who is entitled to notice of an adoption proceeding or whose consent to an adoption is necessary *may attempt* in a collateral proceeding to attack a decree rendered in an adoption proceeding without notice to or consent by such party. (Emphasis added.)

In 39 Am.Jur. Habeas Corpus § 91 is this statement: "A decree for the adoption of a child may be attacked collaterally by a parent in a habeas corpus proceeding to recover custody of the child, where the parent was not a party to the adoption proceedings and had no actual or constructive notice thereof." In short, appellants Crapos' procedural objection to the habeas proceeding merely restates their contention on the merits that the adoption decree was valid and

binding on the Andersens. That contention is inextricably bound up with the Andersens' counter argument on the merits, namely, that they withdrew their consent, were *never parties* to the proceedings since they were never served with notice, and that the adoption decree is therefore void. It is then to the merits of this dispute that we must turn.

## II

It is readily admitted by both parties that absent circumstances not relevant in this case, "consent or its procedural equivalent, notice, forms the basis of a proceeding for adoption." *Leonard v. Leonard,* 88 Idaho 485, 495, 401 P.2d 541, 547 (1965). As a strict corollary, it follows that lack of consent by the natural parents renders an adoption decree void. As the Court of Appeals of Oregon has stated:

> Under our adoption laws, consent of the parents, guardian or other person in loco parentis (except under certain contingencies not involved here), is jurisdictional, and in the absence of such consent the court is without power to proceed. [Citations omitted.] If the court proceeds without the required consent "its decree will be a nullity, not voidable but void * * *." *Furgeson v. Jones,* 17 Or. 204, 219, 20 P. 842, 849 (1888).

*Franklin v. Biggs,* 14 Or.App. 450, 513 P.2d 1216, 1217–18 (1973).

In Idaho, the parallel statutes read as follows:

> 16–1504. *Consent of parents, guardian, nearest relative, or next friend of child—Exceptions.*—A legitimate child cannot be adopted without the consent of its parents, if living, nor an illegitimate child without the consent of its mother, if living, nor without the consent of its guardian if one has been legally appointed or, if no living parents or guardian, then of its nearest relative; if no relative, then by the consent of some person appointed by the judge to act in the proceedings as the next friend to such child.

> 16–1506. *Proceedings on adoption.*—
> . . . Any person or persons whose

consent is required shall execute such consent in writing, and acknowledge the same before any officer authorized by the laws of this or any other state to take acknowledgment of deeds, which consent being filed in the court where the application is made, shall be deemed a sufficient appearance on the part of such person or persons.

There is no dispute regarding the fact that the consents were given in writing before a notary public, *i. e.,* before an officer authorized by the laws of Idaho to take acknowledgment of deeds. Similarly, there is no question here of fraud, duress or undue influence on the part of the Crapos in obtaining the consents. On the contrary, the trial court found that the Crapos "pleaded with the natural parents not to deliver the child and the consents unless the acts were to be final." The trial court in its memorandum decision concluded that the consents were in compliance with the statutory minimum and were valid: "The natural parents had full knowledge of the meaning of their acts in acknowledging consents to adoption and delivering the child for that purpose."

The underlying issue on appeal, therefore, is whether or not natural parents, prior to the entry of a final order of adoption in a private adoption placement, have a right to revoke consents which were concededly valid at the time they were given.

The trial court took its bearings with regard to this question from the survey of the law on that topic made by Chief Justice Shepard in his dissenting opinion in *Duncan v. Davis,* 94 Idaho 205, 211, 485 P.2d 603, 609 (1971):

> [T]he various states are split in three categories, (1) consent is absolutely revocable until a final adoption decree, (2) revocation will be allowed at the discretion of the court, and (3) in the absence of fraud or duress, consent is final and irrevocable.

The majority in *Duncan* found that there had been no fraud or duress in procuring a consent to adoption of her child from an unwed Indian mother. Nonetheless, the

Court scrutinized the consent closely and affirmed the decision of the trial court that the mother had not made "a completely voluntary, free and knowing surrender of her child." *Id.* at 207, 485 P.2d at 605.

Relying on the *Duncan* case for guidance, the trial judge noted that, even in the more difficult case of agency placements, Idaho had rejected the rule holding consents irrevocable in the absence of legal cause.[1] A *fortiori* in the case of a private placement, the trial court concluded that Idaho would align itself with those jurisdictions which grant discretion to the court in allowing natural parents to revoke their consent "absent an estoppel to do so." The trial court then found as a matter of fact that "[a]t the time they revoked their consent, there was not sufficient reliance or circumstances giving rise to an estoppel to assert such right."

■ In reaching this conclusion, the trial court placed great reliance upon the termination of parental rights statute, I.C. §§ 16–2001 to 2015, and its requirement that such a result be achieved judicially and not by contractual relinquishment. We do not believe that the termination statute is controlling rather than I.C. §§ 16–1501 to 1512, the adoption statute. At a January 30, 1978, hearing on a motion for amendment of findings, counsel for Crapos argued cogently that the adoption statutes must govern, providing that these provisions had never been repealed either expressly or impliedly by the termination statutes. The trial court agreed, saying:

I have recognized that such a consent is not void. Obviously it is not. There are probably literally hundreds of adoptions accomplished through consents executed

between parties without any judge involved that later are a foundation for an adoption.

Nonetheless, the trial court felt it relevant *on the question of revocation* that the legislature, in the termination of parental rights context, had seen fit to distinguish formal judicial consents from mere extrajudicial agreements. In other words, the more formal the execution of a consent, the more respect it will be given and the greater the burden a court will impose on those who attempt to revoke it. We agree with the court's reasoning.

■ Factors which will be considered in determining whether or not natural parents should be estopped to revoke their valid consents include:

the circumstances under which the consent was given; the length of time elapsing, and the conduct of the parties, between the giving of consent and the attempted withdrawal; whether or not the withdrawal was made before or after the institution of adoption proceedings; the nature of the natural parent's conduct with respect to the child both before and after consenting to its adoption; and the "vested rights" of the proposed adoptive parents with respect to the child.

*In re Adoption of Capparelli,* 180 Or. 41, 175 P.2d 153, 155 (1946). In the present case, the trial court found that the consent, though valid, was executed at a time when the mother "was extremely distraught, concerned and upset." After delivery of her baby in late May, Kim went to live at her parents' home where, according to the trial court, "she, her children, and her boyfriend were basically persona non grata." Adding to the pressure was the fact that, according

---

1. The present case is distinguishable from *Duncan* in that it does not involve an *agency* placement. Thus it does not come within the rule proposed by the dissent in *Duncan* which would permit "revocation only by proof of fraud, misrepresentation, overreaching and the like" *in those cases "where the parents have surrendered their child to the custody of an agency* licensed by the State Department of Public Welfare." (Emphasis added.) *Id.* at 211–212, 485 P.2d at 609–610 (quoting approvingly from *Catholic Charities of Diocese of Gal-*

*veston v. Harper,* 161 Tex. 21, 337 S.W.2d 111 (1960)). That agency placements present policy considerations requiring tighter controls over attempted revocations is clear from the fact that even a jurisdiction which, in the private placement context, recognizes an absolute right to revoke at any time prior to entry of a final adoption decree, holds a consent to be irrevocable if executed in compliance with the statutory requirements for agency adoptions. *In re Hildenbrand,* 405 Pa. 579, 176 A.2d 900 (1962).

to Kim, her parents were both alcoholics. The following scene, testified to by Kim at the habeas hearing, was said to be typical:

> Q. Were there any situations in the house that might describe to the Court what the environment was really like? A. There's a lot of things. One instance, when I went to get the baby formula I came home and my little boy had diarrhea and my dad had a knife out. My mother—my little baby was naked—my mom was trying to bathe them and the two little girls were down the stairs screaming that Grandpa was going to kill Grandma. I mean, seems like that happened all the time. My other—my little boy had diarrhea everywhere. My dad was rubbing it on the wall. I mean they were insane. So I grabbed my kids and left. And things like that happened all the time, the whole time I was there.

Kim, Andersen and the social worker all testified to the fact that Kim was extremely weak and ill after release from the hospital. The baby was constantly sick and awake crying during most of the night. Andersen would sneak into the house late at night to care for the child so that Kim might get some sleep.

In addition, Kim had no money of her own, Andersen was jobless, and her parents refused to provide support even for formula for the new baby. Hanging over her, as the month of June progressed, was a deadline that she have her two older children in California by July 1 so that her husband by an earlier marriage might exercise his summer visitation rights. Lacking money for plane fares, Kim had to transport the children herself by car. It was in this context that Kim and Robert, on June 24, 1977, handed their baby to the Crapos over a restaurant table and then went to the bank to execute their consents before a notary public.

No sooner had they arrived in California than they felt remorse at having given away their child. That was when they began calling the Crapos requesting the return of their child and eventually sought California and then Idaho counsel. There, in the words of the trial court's memorandum decision,

> they attained a better realization of the nature and future consequences of their consent and they determined to change their minds and demanded the return of their child which in legal effect was a determination to revoke the consent they had given.

The court next addressed the question of "whether the natural parents followed their demands for custody and withdrawn consent with reasonable alacrity to forestall the adoption proceeding." On this question, the court noted that the Andersens "did pursue the matter but not to the most intelligent use of facts which were known."[2] The court stated its belief that the Andersens' failure to locate the adoption proceedings and appear therein was not a crucial issue, because "the battle lines had been already clearly drawn," and the appellants Crapos were fully aware of that fact. Unfortunately, the adoption proceedings went forward with a Crapo decision to decline the initiative in placing in issue the Andersens' attempts to revoke their consents and regain their child. Nor did they feel obligated to so inform the adoption court. Again, in the words of the trial court:

> The adoption judge was presented a report prepared by the Department of Health and Welfare, gleaned from the proposed adoptive parents, that the natural parents had moved to California and had made several phone calls wanting the baby back, described as harassing in nature, in the middle of the night and when it appeared they were intoxicated. A letter from the parents' attorney, dated August 9, 1977, received by Respondents two or three days later, demanding return of the child, was not mentioned in the adoption proceeding.

2. The investigation and report of the Department of Health and Welfare stated:

Petition for adoption without a case number and without a name for the child was filed in the District Court of the Seventh Judicial District of the State of Idaho, on the 15th [sic] day of August 1977. This was signed by Reginald R. Reeves, Esq., Petitioners attorney.

The Department of Health and Welfare *did* conduct the "thorough investigation" mandated by I.C. § 16–1506. At the time of the adoption proceeding, the Department stated that it had been unable to verify the status of Andersen since he had not been named on the birth certificate, and that it was not sure of Kim's own status since she was listed on the birth certificate as "Staley" (her maiden name) but had signed the consent as "Kerns" (the name of her first husband). Under these circumstances, the Department particularly disapproved of the informal consent signing procedure since it was impossible to tell "the present legal status of this child," or even "if the proper people executed the consents." The Department further noted the fact that the natural parents had called demanding the child back and that future problems would probably arise because the identity of the adoptive parents was known to Kim and her relatives. The Department expressed high regard for the Crapos and their relation to Mrs. Crapo's children from earlier marriages, concluding that while it could "recommend Mr. and Mrs. Gordon Crapo as suitable adoptive parents," it was "unable to recommend the availability of this child or the suitability of this child for adoption." This appraisal, certainly tantamount to disapproval, was not mentioned in the order of adoption.

Summarizing its review of the factors a court must consider in addressing the question of whether natural parents should be estopped to revoke their consents, the trial court concluded:

> whereas here the proposed adopting parents knew of the vacillating feeling of the natural mother toward giving the child to adoption, knew of some of the conditions giving rise to her problem and under which she labored, and within a few weeks after the consents had been obtained were advised of the change of mind, the law should be that such an oppressed and emotionally unstable 21-year old natural mother should have the right to change her mind.

Therefore, the court concluded that at the time the Andersens revoked their consent, they were not estopped to do so. We agree. The record fully supports this conclusion and the trial court did not abuse its discretion in reaching it.

Case law from other jurisdictions must be studied critically since, as one court has remarked, in adoption cases, "the principal participants in one are no more alike to those in another than their fingerprints." *In re D——,* 408 S.W.2d 361, 368 (Mo. App.1966). It would be impossible to find another case in which both the circumstances of the parties and the statutory framework of the jurisdiction will be found identical. Moreover, for every proposition of law announced in one jurisdiction, the exact opposite may be found elsewhere. Still, we find it significant that other jurisdictions, under generally similar fact patterns, have reached the same conclusion we reach today.

In *Warner v. Ward,* 401 S.W.2d 62, 63 (Ky.1966), the Kentucky Court of Appeals upheld a trial court judgment denying adoption and directing the adoptive parents to restore custody of the child to its natural mother on the strength of her pleadings,

> (1) that her consent to the adoption had been procured at a time when she was a minor and had no advice from anyone but her mother and her mother's attorney, was without means to provide for the baby, and was under extreme pressure, (2) that she had now married the child's father, and (3) that she and her husband desired to and could provide adequate support and care for the child.

The court concluded:

> If "sufficient reason is shown there may be a revocation before final judgment." *Skaggs v. Gannon,* 293 Ky. 795, 170 S.W.2d 12, 16 (1943). That the act of relinquishment or consent was performed under circumstances of temporary distress or discouragement is a sufficient reason.

*Id.*

The Court of Appeals of Oregon, in *Franklin v. Biggs,* 14 Or.App. 450, 513 P.2d 1216 (1973), cited similar factors in over-

turning the decrees of the lower court permitting the adoption of an unwed mother's twin daughters. The court, in finding that the natural mother was not estopped to withdraw her consent, noted that at the time the consent was executed, the woman "was alone, had no one to turn to for advice, was impoverished and on public welfare," and that when she "did obtain legal assistance, she affirmatively withdrew her prior consent." *See also In re Adoption of Thompson,* 178 Kan. 127, 283 P.2d 493 (1955); *Green v. Paul,* 212 La. 337, 31 So.2d 819 (1947); *People ex rel. Scarpetta v. Spence-Chapin Adoption Serv.,* 28 N.Y.2d 185, 321 N.Y.S.2d 65, 269 N.E.2d 787, *appeal dismissed sub nom. DeMartino v. Scarpetta,* 404 U.S. 805, 92 S.Ct. 54, 30 L.Ed.2d 38 (1971); *In re Adoption of Hunter,* 421 Pa. 287, 218 A.2d 764 (1966); *In re D.L.F.____,* 85 S.D. 44, 176 N.W.2d 486 consent becomes irrevocable only where 30 days have elapsed after notice of the adoption hearing is received, *see In re Anonymous,* 55 A.D.2d 383, 390 N.Y.S.2d 433 (1977); where the court observed also the distinction between judicial and nonjudicial consents. Judicial consent there, similar to the consent of our termination statutes, Idaho Code ch. 20, tit. 16, requires that the consent be executed or acknowledged before a judge or surrogate of the court where the adoption proceedings are to be initiated and is irrevocable if the consent so states. However, at the time of execution, the consenting parent is to be informed in detail of the consequences of the act by the judge or surrogate.

We are not unaware of the fact that there are jurisdictions, under the facts of this case, which would likely affirm the adoption decree on the grounds that "the best interests of the child" would best be served in the home of the adoptive parents. Such courts, though recognizing an initial right to custody on the part of the natural parent, nonetheless hold that right totally subordinate to the concern of the state, as *parens patriae,* in promoting the child's welfare and best interests. As such, they tend to recognize the rights of the "psychological parents," who have formed a "focus relationship" or "affective relationship" with the child, over the rights of mere "flesh and blood" which are asserted by the "biological parents." These jurisdictions hold the natural parents' consents to be irrevocable absent fraud or some overriding equitable consideration. *See In re Adoption of Child by P,* 114 N.J.Super. 584, 277 A.2d 566 (App. Div.1971). *See also In re Holman's Adoption,* 80 Ariz. 201, 295 P.2d 372 (1956); *In re Child,* 1 Mass.App. 256, 295 N.E.2d 693 (1973); *In re Hendrickson,* 159 Mont. 217, 496 P.2d 1115 (1972).

The Idaho decisions, however, have stressed again and again, in a variety of contexts, the inherent rights of natural parents to the custody of their own children. *See,* for example, *Clayton v. Jones,* 91 Idaho 87, 416 P.2d 34 (1966); *Leonard v. Leonard,* 88 Idaho 485, 401 P.2d 541 (1965); *Smith v. Smith,* 67 Idaho 349, 180 P.2d 853 (1947); *Bedal v. Johnson,* 37 Idaho 359, 218 P. 641 (1923); *Jain v. Priest,* 30 Idaho 273, 164 P. 364 (1917). With such a background, we are more inclined to follow those jurisdictions which hold that, in the context of an adoption proceeding, the "contest between a parent and nonparent [may not] resolve itself into a simple factual issue as to which affords the better surroundings, or as to which party is better equipped to raise the child." *People ex rel. Scarpetta v. Spence-Chapin Adoption Service, supra,* 321 N.Y. S.2d at 72, 269 N.E.2d at 792.

The Court of Appeals of Oregon, in language that we adopt as our own, has recently settled this question as follows:

In the absence of any additional grounds for an "estoppel" . . . a more "acceptable" economic or emotional environment has never been approved as an adequate basis for the termination of parental rights which an adoption over the objections of a natural parent represents. The "best interests" rule has consistently been tempered by the refinement that "* * * courts should not interfere with the natural relationship of parent and child upon the sole ground that the proposed adoptive parents are able to give the child superior advantages over

those within the means or social status of the natural parents * * *."

. . . . .

Where, as here, a natural mother not represented by legal counsel at the time consent is given attempts to withdraw that consent within a few weeks and thereafter takes reasonable steps available to regain the custody of her child, neither so-called "vested rights" nor superior economic or social position of the proposed adoptive parents will serve to deprive that withdrawal of legal effect.

The hardships produced by a separation of the child and the petitioners [the adoptive parents] at this time are in substantial measure the result of the petitioners' resistance to the natural mother's efforts to regain custody. Those hoping to become adoptive parents cannot create their best argument for keeping a child's custody by thwarting a natural parent's known wishes.

*Small v. Andrews,* 20 Or.App. 6, 530 P.2d 540, 544–45 (1975).

Much of the heartache of this case could have been avoided had the legislature, in observation of the provisions of the termination act, seen fit to insist upon more formal proceedings in obtaining a natural parent's consent to adoption in the context of private placements. As pointed out above, the adoption statute, I.C. § 16–1506, permits a petitioner to obtain the required consent in a highly informal manner. This consent need only be in writing and acknowledged before any officer authorized to take an acknowledgment of a deed; in other words, a notary public. This is a far cry from a judicial proceeding.[3] When this consent is filed in the court where the adoption petition is presented, it is deemed

a sufficient appearance on the part of the person or persons. There is no specific requirement that notice of the proceeding be given to the parents who have executed such consents, and, as mentioned at the outset, the consents serve also as waivers of notice and as an appearance, sufficient on the part of the consenting parents.

■ The Supreme Court of the United States has held that due process requires that before an individual can be deprived of life, liberty or property by adjudication, he must be given notice and opportunity for a hearing appropriate to his case. *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 313, 70 S.Ct. 652, 94 L.Ed. 865 (1950). In *D. H. Overmyer Co., Inc., of Ohio v. Frick Co.,* 405 U.S. 174, 185, 92 S.Ct. 775, 31 L.Ed.2d 124 (1972), the same Court held, however, that those due process rights of notice and hearing prior to civil judgment *are* subject to waiver. The standard for a valid waiver stated in that case was the same as that applied in criminal cases, *i. e.,* was the waiver voluntarily, knowingly and intelligently made, and with full awareness of the legal consequences? This standard is, as it should be, equally applicable when the waiver is a concomitant part of the consent by the natural parents to the adoption of their child. *Cf. Armstrong v. Manzo,* 380 U.S. 545, 85 S.Ct. 1187, 14 L.Ed.2d 62 (1965). *Leonard v. Leonard, supra.* The informal consent procedure provided for by I.C. § 16–1506 fails to make any allowance for requiring a showing that the waiver effected thereby is made voluntarily, knowingly, and intelligently.

At the same time, and contrariwise, the Idaho termination statutes provide for formal proceedings and thus afford far greater protection in terms of consent. The underlying philosophy is to strengthen and pre-

3. The choice of words used by the district court is noteworthy:

The natural parents are not truly parties to the ordinary adoption proceeding and their acknowledged consent can involve a consent that can be used in most foreign state courts, and any Idaho court, though the consent does not name and designate the particular court. It can be of the nature that it simply says that in some court at some time the child can

be adopted; hardly, then, the ordinary encompassed meaning of being a party to the proceeding.

The consents in this case gave no indication of any court in which they might be filed, or even that they were intended for court use. The consents contained no statement that use could be made of them as general appearances or as waivers of notice.

serve family life whenever possible, and that, when the parent-child relationship is severed, a judicial determination is required rather than severance by contractual arrangements. I.C. § 16–2001. I.C. § 16–2006 provides for the situation where parents consent to termination, and therefore no subsequent hearings are required on the merits of the petition. However, the consent must be witnessed by a district judge or magistrate and follow a form which is provided in the statute. After a petition is filed and the time and place of the hearing determined, the parents or any other concerned party must be personally served. If reasonable efforts fail to obtain personal service, then service must be obtained by registered or certified mail at the last known address and by publication. "Notice and appearance may be waived by a parent in writing before the court or in the presence of, and witnessed by, a clerk of court or a representative of an authorized agency, provided that such parent has been apprised by the court or by such person of the meaning and consequences of the termination action." I.C. § 16–2007.

The district court thoroughly noted the shortcomings of the nonjudicial consent provisions as compared to the judicial consent of termination proceedings. While the decision of the court was not based thereon, the court did not act improperly in considering the vast difference between the two qualities of consents available. A judicial consent is to be preferred.

Until such time as the legislature offers positive and detailed guidance on this issue, the parties to private adoptions will continue to incur inevitable risks in their informal dealings with one another.

We affirm the district court order granting the writ of habeas corpus and voiding the adoption decree. Costs to respondents.

McFADDEN and DONALDSON, JJ., concur.

BAKES, Justice, dissenting:

I dissent from the majority's analysis and disposition of both the procedural issue concerning the respondents' collateral attack of the adoption decree and the substantive issue concerning the respondents' attempt to revoke the consent to adoption. Inasmuch as the latter issue is of much greater significance, not only to these parties but also to parents and children in general, I address that issue first.

I

Although the majority characterizes the natural mother as being "extremely distraught, concerned and upset" when she executed the consent and delivered the child, it is important to bear in mind at the outset that her emotional condition is not an issue in this appeal. There is no question that both natural parents freely gave their written consent to the adoption with full knowledge of its meaning and effect.[1] Thus, this case is not like *Duncan v. Davis,* 94 Idaho 205, 485 P.2d 603 (1971). In *Duncan* the trial court found that the natural mother "did not make a completely voluntary, free and knowing surrender of her child, and did not have any intention to forever surrender all right or claim to her baby." 94 Idaho at 207, 485 P.2d at 605. Based on that finding, this Court upheld a revocation of the consent to adoption. Here, the trial judge in his memorandum decision expressly distinguished the circumstances presented in *Duncan* and found:

"The natural parents had full knowledge of the meaning of their acts in acknowledging consents to adoption and delivering the child for that purpose. The Respondents [appellants on appeal] are not responsible for any of the pressures that were upon the natural parents to place the baby for adoption. On the contrary [they] made efforts to assure that there

---

1. The natural mother was not married to the father of the child at the time she surrendered the child to the appellants, and therefore the father's consent was not necessary under I.C. § 16–1504. Nevertheless, both the natural mother and her present husband, respondent Robert P. Andersen, who claims to be the father of the child, executed the consents, and together they delivered the child to the appellants.

was understanding of the meaning of the transaction and to communicate the importance to the natural parents that the transaction be considered final."

Moreover, regardless of the majority's inferential criticisms of private adoptions, *ante* at 963, n.1, in this case the natural mother herself decided against an agency adoption in favor of a private adoption so she could select the adoptive parents. The natural mother asked a relative to locate a suitable couple and, after the relative had found the appellants, asked a friend, a social worker, to "check them out." The natural mother and the social worker consulted an attorney and secured the consent forms. The natural mother, after then temporarily deciding against the adoption, changed her mind once more and asked the appellants to again consider adopting the child. Upon learning that the appellants were still willing to adopt the child, the mother asked the appellants to meet her at an Idaho Falls restaurant. The natural parents, after the appellants had "pleaded with [them] not to deliver the child and the consents unless the acts were to be final," surrendered the child and the executed written consents. There is no question that at the time the natural parents surrendered the child to the adoptive parents and signed the consent forms they fully intended to terminate their parental rights to the child and to place him in the custody of the appellants for adoption. There is absolutely no suggestion of any fraud, duress or undue influence on the part of the appellants. In short, the Court is presented with a case in which the natural mother, admittedly distraught and upset but not to the extent that she failed to understand the significance of her actions, knowingly and voluntarily consented to the adoption of her child and surrendered custody of him. Later she simply changed her mind.

The majority opinion places great emphasis on the district court's statement that the natural mother "was extremely distraught, concerned and upset" at the time the consent was given. *Ante* at 963. However, such emotional stress is to be expected. Even when wisely and prudently made, a mother's decision to consent to the adoption of her child is unquestionably an emotionally painful and traumatic experience. Emotional stress is always likely to be present when such decisions are made. The mother's decision is usually made in the face of adverse social and economic conditions, since these very conditions are frequently the basis for the decision. The Massachusetts Court summarized the situation as follows:

> "Contemplation of the surrender of one's own child is in many, if not all, cases a cause of emotional and mental stress. Many such surrenders are undoubtedly by mothers of children born out of wedlock and are contemplated because the trying circumstances tend to show that the welfare of the child calls for action at variance with that dictated by natural instincts of maternal love and affection. No statute has said that surrenders are valid only if executed free from emotion, tensions, and pressures caused by the situation. No principle of law requires the rule. A balance of the interests of the persons concerned and of society weighs strongly against it." *In re Surrender of Minor Children*, 344 Mass. 230, 181 N.E.2d 836, 839 (1962).

*See Regenold v. The Baby Fold, Inc.*, 68 Ill.2d 419, 12 Ill.Dec. 151, 160, 369 N.E.2d 858, 867 (1977); *Doe v. Roe*, 87 N.M. 253, 531 P.2d 1226, 1228 (Ct.App.1975); *In re Adoption of K_____*, 24 Utah 2d 59, 465 P.2d 541, 542 (1970). Nevertheless, there is absolutely no indication that the mother did not fully understand the significance of her actions. To rule, as the majority does, that a "distraught, concerned, and upset" mother is entitled to revoke her consent is, as a practical matter, to rule that virtually all consents may be revoked.

Before any adoption based on the voluntary consent of the natural parents can be fully and ultimately consummated, a point in time must come at which the natural parents' right to simply change their minds and revoke that consent must finally and forever cease. This case, stripped to its essential issue, requires the Court to identify that point in time.

In making this determination it is essential to understand the legal context of the revocation issue. Legal adoptions did not exist at common law and exist today only by virtue of legislative acts. H. Clark, The Law of Domestic Relations § 18.1 (1968); *see generally Bedal v. Johnson,* 37 Idaho 359, 218 P. 641 (1923). The issue presented here, therefore, is really one of statutory construction, *In re Adoption of Jackson,* 89 Wash.2d 945, 578 P.2d 33 (1978), which this Court must resolve in light of the legislature's intent and the policies and purposes of the adoption statute. *See Byrd v. Employment Security Agency,* 86 Idaho 469, 388 P.2d 100 (1964). The purposes of adoption statutes have been summarized as follows: "Broadly those policies include promoting the best interests of children while at the same time protecting as far as possible the interests of both natural and adoptive parents." H. Clark, *supra,* § 18.3 at 614. *See* 3 C. Sands, Sutherland Statutory Construction § 68.04 (4th ed. 1974). Indeed, examination of their historical background suggests that adoption statutes were chiefly a consequence of a growing concern for the welfare of children. *See* Presser, The Historical Background of the American Law of Adoption, 11 J.Fam.L. 443 (1972). It is with these policies in mind—the promotion of the child's welfare and, subordinate thereto, the protection of the interests of the natural and adoptive parents—that this Court must resolve the revocation issue. *See Department of Social Welfare v. Superior Court,* 1 Cal.3d 1, 81 Cal.Rptr. 345, 459 P.2d 897 (1969). *Stjernholm v. Mazaheri,* 180 Colo. 352, 506 P.2d 155 (1973).

Such a decision, therefore, must be based upon a careful consideration of the interests of the child and the interests of the natural and adoptive parents. The interests of the child, particularly infant children, are best served if the consent becomes irrevocable as early as possible in the adoption process, ideally at the time the consent is given and custody of the child surrendered. Attributing finality to the consent at that time protects the child from the trauma of being grasped, months or years later, from the only home, parents and family that it has ever known and from all the love and security they represent and the emotional shock of being forced into a strange environment with persons who are total strangers to the child. *See, e. g., Mitchell v. Pincock,* 99 Idaho 56, 577 P.2d 343 (1978). It is widely recognized that such changes in custody may result in serious and perhaps permanent emotional harm to the child. *See In re Child,* 1 Mass.App. 256, 295 N.E.2d 693 (1973); *In re Adoption of Child by P,* 114 N.J.Super. 584, 277 A.2d 566 (App.Div. 1971); H. Clark, *supra,* § 18.4 at 628; Comment, The Adoption of Baby Lenore: Two Interpretations of a Child's Best Interests, 11 J.Fam.L. 285, 305–09 (1972); Note, Alternatives to "Parental Right" in Child Custody Disputes Involving Third Parties, 73 Yale L.J. 152, 158 (1963). The Washington Supreme Court, summarizing the reasons for making consents irrevocable at an early stage, recently stated:

"There are reasons to require an early termination of the ability of a parent to revoke consent to adoption. Infants are not held in hospitals for lengthy periods of time, prospective adoptive families are often found with rapidity and strong emotional ties are formed which should not be subject to being severed unless the prospective adoptive parents are unfit to so serve. The early confirmation of the consent and relinquishment removes a major uncertainty." *In re Adoption of Jackson,* 89 Wash.2d 945, 578 P.2d 33, 36 (1978).

Furthermore, it is in the child's best interest if the time at which the consent is considered final and irrevocable is also definite and easily ascertainable. Uncertainty, as this case verifies, breeds litigation which, regardless of how the issues are ultimately decided by the courts, often results in tragedy for the child. Given the understandable intensity with which parties pursue these cases, such litigation frequently involves both trials and appeals which, despite efforts by trial and appellate courts to expedite the matters, often consume years before the matters are finally resolved. *See, e. g., Mitchell v. Pincock, supra.* Nei-

ther God nor the legislature has empowered the courts to stay the emotional development of children under such circumstances. During the pendency of litigation the child will inevitably begin to form tender, emotional attachments with its adoptive parents which frequently will be shattered by the courts' final disposition. In short, extended litigation in these cases generally represents a tragedy for the child. Much of this could be avoided by a clear, decisive and easily ascertainable standard for determining, short of prolonged litigation, when and if a consent is revocable. In this respect the majority opinion fails egregiously. The standard adopted by the majority, estoppel, does not provide the public with any clear guidelines. It is a standard which only the courts can apply. Under that standard, questions concerning revocation cannot be resolved with any certainty without litigation.

Although not entirely clear from the opinion, the majority seems to hold that the trial court may permit the natural parents to revoke their consent at any time, even after a formal decree of adoption, unless conditions of estoppel are present. Such a standard not only exposes the child to the possibility of being juggled between the parties for an uncertain period of time but, when there is a dispute, virtually assures that the child will be the unintended victim of lengthy litigation during which the parties and the courts struggle to apply that standard. The majority opinion represents a sad defeat for the welfare and interests of children, precisely those whom the statutory provisions in question were designed to protect.

Even more troubling, however, is the tenor of the majority's approach. The majority recognizes the *natural parents'* right to revoke their consent unless the *adoptive parents* have sufficiently relied on the consent so as to estop a revocation. No consideration is given to or even mention made of the child's interests. Rather, the majority reduces the question to a dispute between two sets of parents over possession of what might just as well be a chattel. It is the majority's refusal to even consider the interests of the child from which I am compelled to most strongly dissent.

Not only does the majority opinion ignore the interests of the child, it ironically also fails to promote the interests of either the adoptive or natural parents. Like the child's, the adoptive parents' interests dictate that the consent be considered final at an early and definite moment. Adoptive parents are certainly entitled to proceed with the adoption, to begin to establish close family bonds with the child, and to integrate the child into their home without the threat of lengthy litigation resulting from a capricious change of mind by the natural parents. Indeed, the majority's approach, which renders any consent tentative for an undetermined period of time, is likely to discourage parents from seeking adoptions and thereby hinder and frustrate the policies of the adoption act.

"It is apparent that if in particular cases the unstable whims and fancies of natural mothers were permitted, first, to put in motion all the flow of parental love and expenditure of time, energy and money which is involved in adoption, and then, as casually, put the whole process in reverse, the major purpose of the statute would be largely defeated." *In re Adoption of a Minor*, 79 U.S.App.D.C. 191, 197, 144 F.2d 644, 650 (1944).

"Public policy demands that the adoption act should not be nullified by a decision that causes the public to fear the consequences of adopting a child with the full knowledge that their efforts are at the whim and caprice of a natural parent." *Welfare Division v. Maynard,* 84 Nev. 525, 445 P.2d 153, 155 (1968), *quoting Ex parte Schultz,* 64 Nev. 264, 181 P.2d 585, 589 (1947).

The rule of law pronounced by the majority also leaves adoptive parents particularly vulnerable to extortion by unscrupulous natural parents, although there is no indication of such activity in this case. *See In re Adoption of F——,* 26 Utah 2d 255, 488 P.2d 130, 134 (1971); *In re Adoption, Hecker,* 448 S.W.2d 280, 286 (Mo.App.1969).

The majority ignores the interests of children and adoptive parents and emphasizes the plight of the natural mother and the presumption in favor of natural parents. However, the natural parents actually have the least interest in the specific point at which a consent becomes irrevocable, though they certainly have a strong interest in knowing when it is. Unlike the child and the adoptive parents, the natural parents have complete control over when the consent is given. There is no deadline for the natural parents. They can surrender the child and consent to the adoption at any time which best fits their needs and interests. That most natural parents choose to give the child for adoption at birth recognizes the sociological fact that the longer the decision for adoption is delayed the more difficult it is to sever the emotional bonds between the mother and the child. But the decision is solely the natural parents' to make, and in the absence of fraud, coercion, or undue influence they should be bound by it, because after the consent is given and the child placed with the adoptive parents, the same emotional bonds are forged with the new parents. By changing her mind the natural mother is not merely exercising what the majority apparently finds to be the natural right of an "extremely distraught, concerned and upset" woman, but is destroying the emotional bonds which the child has forged with its new parents and, in most cases, the only parents and family it has ever known.

Even if the natural mother is presently unable to care for the child, the mother is still not required to make a final decision concerning adoption. The mother may have the child placed with foster parents until she is either in a position to properly care for the child herself or until she can make a final decision concerning adoption. What is important for the mother is that she know at the outset the point in time when her consent will be considered final and irrevocable. Given the importance of the decision and the strong emotional ties a mother naturally feels toward the child to which she gave birth, a mother who consents to adoption, once free of practical tasks of caring for the child, will typically experience some subsequent misgivings about the decision. *Regenold v. The Baby Fold, Inc.,* 68 Ill.2d 419, 12 Ill.Dec. 151, 160–61, 369 N.E.2d 858, 867–68 (Ill.1977); Katz, The Adoption of Baby Lenore: Problems of Consent and the Role of Lawyers, 5 Fam.L.Q. 405, 411 (1971). For such a mother, it is important that she know whether she can in fact reverse her decision and regain custody of the child or whether she must put such matters behind her and focus her concerns on working toward a brighter future. The equivocal ruling of the majority is a disservice to such mothers. It will encourage them to continually rehash their decisions, foster a false hope in their hearts that the courts will permit such revocations, and divert their attention from making permanent adjustments to a new life without the child.

In sum, the majority's ruling serves the best interests of no one. The interests of all the parties, and particularly those of the child, dictate that in the absence of fraud, duress or undue influence, a consent to adoption knowingly and voluntarily made should be considered irrevocable at the time it is given and the custody of the child is surrendered.

In my view, not only do the interests of all the individuals affected require such a conclusion, but also a careful reading of the pertinent statutes. I.C. § 16–1506 provides that a written consent by the natural parents, properly acknowledged and filed with the court, "shall be deemed a sufficient appearance on the part of such person or persons." The natural parents are not among those required by I.C. § 16–1506 to be present at the adoption hearing and the statute does not provide for notice to them of the adoption petition, hearing or order. It is indeed anomalous to conclude, as the majority does, that the legislature intended such consents to be tentative and revocable by the natural parents for an indefinite period of time when the legislature clearly envisioned that the consenting parents would generally not participate in or even receive notice of the adoption proceedings.

Moreover, the legislature was not entirely unmindful of the revocation issue. In I.C. § 16–1504 the legislature provided: "[t]he consent of a parent who is a minor shall not be voidable because of that minority." In interpreting a similar District of Columbia statute and ruling that a consent for adoption was irrevocable, the United States Court of Appeals concluded:

"It is inconceivable that Congress—. . . while forbidding, specifically, a method of avoidance [minority] favored in the law above all others—could possibly, at the same time, have contemplated *unrestricted withdrawal of consent without cause or reason of any kind.* Instead . . . Congress has with deliberation and finality closed the door against changes of mind. It has restored to the court . . . its old power . . . to diagnose the case of the unfortunate infant and prescribe a course of treatment for its future; unhampered by the changing winds of emotion which alternatively submerge and restore parental attributes." *In re Adoption of a Minor,* 79 U.S.App.D.C. 191, 195, 144 F.2d 644, 648 (1944) (emphasis in original).

*Accord, In re Adoption of Holman,* 80 Ariz. 201, 295 P.2d 372 (1956). Likewise it is inconceivable that the Idaho legislature could on one hand deny natural parents the highly favored defense of minority and on the other hand intend that they be permitted to revoke such consents at will.

The majority, however, refuses to uphold the obvious intent of the legislature and criticizes the legislature for not requiring that consents be executed before the courts. Until 1969, I.C. § 16–1506 required that the consents of county residents be signed before the probate judge. In 1969 the legislature amended that section by providing that the consents of residents and non-residents need only be acknowledged by an "officer authorized . . . to take acknowledgments of deeds." Ch. 188, § 2, 1969 Idaho Sess. Laws 554. Requiring such consents to be given before a judge may be preferable to the present procedure and may reduce the number of attacks on such consents on

the grounds that they were not knowingly and voluntarily given or were given as the result of fraud, duress or undue influence. *Cf. Duncan v. Davis,* 94 Idaho 205, 485 P.2d 603 (1971) (upholding conclusion that mother did not knowingly and voluntarily consent). However, those are not the problems presented here. There is no question that the respondents' consent was legally sufficient and there is no question that it was freely and voluntarily given with a full understanding of its meaning and effect. There is no question that at the time the mother gave the consent she fully intended to permanently relinquish her rights to the child and to give the child to the appellants for adoption. There is no basis for supposing that her actions would have been any different had the consent been acknowledged by a judge rather than a notary public. The problem raised here is simply that subsequent to giving the consent the mother changed her mind, an occurrence unrelated to the manner in which the consent was executed. In criticizing the statutory manner for acknowledging consents, the majority is simply tilting with an issue not present in this case. In any event, that a majority of the members of this Court may prefer a manner for acknowledging consents to adoption different from that provided by the legislature is no basis for ignoring the Court's duty to properly apply the laws, as enacted, in accordance with the intent of the legislature.

For the above stated reasons I would conclude that in the absence of fraud, duress or undue influence consents to adoption become final and irrevocable upon execution and delivery and surrender of the child. This rule is widely recognized in an increasing number of jurisdictions. *See, e. g., In re Adoption of Holman,* 80 Ariz. 201, 295 P.2d 372 (1956); *Regenold v. The Baby Fold, Inc.,* 68 Ill.2d 419, 12 Ill.Dec. 151, 369 N.E.2d 858 (1977); *Golz v. Children's Bureau of New Orleans, Inc.,* 326 So.2d 865 (La.1976); *In re Child,* 1 Mass.App. 256, 295 N.E.2d 693 (1973); *Doe v. Roe,* 87 N.M. 253, 531 P.2d 1226 (Ct.App.1975); *Welfare Division v. Maynard,* 84 Nev. 525, 445 P.2d 153

(1968); *Catholic Charities of the Diocese of Galveston, Inc. v. Harper,* 161 Tex. 21, 337 S.W.2d 111 (1960); *In re S.,* 572 P.2d 1370 (Utah 1977). Nevertheless, I do believe the fact that the natural mother, subsequent to consenting to the adoption, has had a change of heart and now is desirous and willing to care for the child may be significant in the adoption proceedings. I.C. § 16–1507 requires that before entering a final order of adoption the judge must be "satisfied that the interests of the child will be promoted by the adoption." Certainly the natural parents' desire to regain custody of the child and their present willingness to assume the parental responsibility for the child are relevant to the judge's determination whether the proposed adoption is in the child's best interests. If convinced that the best interests of the child would be promoted by returning the child to the natural parents, the judge, in my view, would be entitled under I.C. § 16–1507 to deny the adoption petition and order the child returned to the natural parents. However, such decision must be based upon careful findings that such action would in fact serve the child's best interests and not merely upon the fact that the natural parents have changed their minds. This interpretation of Idaho's adoption act best ensures that its primary purpose, the promotion of the welfare of children, will be served. It also conforms to the principles embodied in the Uniform Adoption Act prepared by the National Conference of Commissioners on Uniform State Laws. The model act allows the revocation of consents to adoption only if a decree has not yet been entered and then only if a court finds that the revocation would serve the best interests of the child. Uniform Adoption Act § 8 (amended 1971).

The development of New York law in this area is also instructive. In *Scarpetta v. Spence-Chapin Adoption Service (Baby Lenore),* 28 N.Y.2d 185, 321 N.Y.S.2d 65, 269 N.E.2d 787, *appeal dismissed sub nom. De-Martino v. Scarpetta,* 404 U.S. 805, 92 S.Ct. 54, 30 L.Ed.2d 38 (1971), a case which the majority relies upon and which provoked nothing but criticism from commentators,

*see, e. g.,* Note, In the Child's Best Interests: Rights of the Natural Parents in Child Placement Proceedings, 51 N.Y.U.L. Rev. 446, 454 (1976), the New York Court of Appeals, emphasizing the common law presumption in favor of natural parents, upheld a revocation made five days after the child had been placed in an adoptive home. In response to that decision, the New York legislature amended the state's adoption statute to provide that in a private placement adoption a consent executed before a court was irrevocable. The New York legislature also provided that a consent not executed before a court was revocable for thirty days, but only if the court found that the revocation was in the child's best interests. The New York legislature also specifically eliminated any presumption in favor of the natural parents in such disputes. N.Y.Dom.Rel.Law § 115–b (McKinney 1977). I predict that the majority's decision in this case will influence the Idaho legislature in the same way that *Scarpetta* influenced the New York legislature.

In rejecting the interpretation of the Idaho Adoption Act in harmony with its language and policies, the majority resorts to a mischaracterization of the best interests of the child standard, *ante* at 966, and relies entirely upon "the inherent rights of natural parents . . . ." *Ante* at 966. The "best interests" test is much more than a mere comparison of the social status and economic means of the competing sets of parents, as is suggested by the majority's selective quotation from an Oregon intermediate appellate court decision, *ante* at 966. Rather, the best interests standard involves a careful weighing of the myriad factors, such as the character and maturity of the parents, their commitment to the care of the child, the child's present bonds of affection, the family setting and stability, and so forth, which together form the foundation for a stable and happy home for the child. *See generally Riener v. Riener,* 93 Idaho 900, 477 P.2d 841 (1970); *Child v. Clouse,* 93 Idaho 893, 477 P.2d 834 (1970); *Tomlinson v. Tomlinson,* 93 Idaho 42, 454 P.2d 756 (1969); *Anderson v. Smith,* 79 Ida-

ho 68, 310 P.2d 783 (1957); *Paul v. Paul,* 78 Idaho 370, 304 P.2d 641 (1956); Comment, Paternal Custody of Minor Children in Idaho, 8 Idaho L.Rev. 345, 347 (1972). Status and wealth are no guarantee of a happy home for the child, although the financial inability to provide for the essential needs of the child often leads to an unsuitable environment for the child. The biological affinity between a natural mother and her child is an important factor to be considered in applying the best interests test. But, on the other hand, repeated changes of the mind by the natural mother concerning whether she wants to give her child for adoption may also indicate a superficial and wavering commitment to the care of the child. What is important is that the judge before whom the adoption is pending take all of these considerations into account in determining what is in the child's best interests. In deciding whether to deny the adoption petition and return the child to the natural parents because of their change of heart, the judge must set aside the personal and often selfish and egocentric wishes of both the natural and adoptive parents and be guided principally by the best interests of the child. *Cf. Mast v. Mast,* 95 Idaho 537, 539, 511 P.2d 819, 821 (1973) (child custody proceeding).

While this Court has long recognized the right of natural parents to the care and custody of their own children,[2] it has also recognized that this right is not absolute. *Yearsley v. Yearsley,* 94 Idaho 667, 496 P.2d 666 (1972); *Child v. Clouse,* 93 Idaho 893, 477 P.2d 834 (1970); *see Stjernholm v. Mazaheri,* 180 Colo. 352, 506 P.2d 155 (1973). By their own actions—typically neglect or abandonment of the child—or by a finding

that they are not fit, the natural parents may lose the benefit of the rule assuring them the right to the care and custody of their children and trigger judicial inquiry into whether the best interests of the children require a severance of those rights. *See Moss v. Vest,* 74 Idaho 328, 262 P.2d 116 (1953). In my view, a voluntary and knowing consent to adoption by which the natural parents evidence the intent to permanently relinquish their rights to the child and to have the child adopted and forever cared for by someone else constitutes a waiver of the benefits of the general rule favoring natural parents. Other courts have described this relationship between the right of natural parents to custody of their children and their right to revoke a consent to adoption as follows:

"Ordinarily the law presumes that the best interest of the child will be subserved by allowing it to remain in the custody of the parents, no matter how poor and humble they may be, though wealth and worldly advancement may be offered in the home of another. Where, however, a parent, by writing or otherwise, has voluntarily transferred and delivered his minor child into the custody and under the control of another, as in the case at bar, and then seeks to recover possession of the child by writ of habeas corpus, such parent is invoking the exercise of the equitable discretion of the court to disrupt private domestic relations which he has voluntarily brought about, and the court will not grant the relief, unless upon a hearing of all the facts it is of the opinion that the best interests of the child would be promoted thereby." *Stanford v. Gray,* 42 Utah 228,

---

2. The statement in the majority opinion that "Idaho decisions, however, have stressed again and again, in a variety of contexts, the inherent rights of natural parents to the custody of their own children," *ante* at 966, is somewhat of an overstatement of the authority cited in support of that conclusion. *Clayton v. Jones,* 91 Idaho 87, 416 P.2d 34 (1966); *Leonard v. Leonard,* 88 Idaho 485, 401 P.2d 541 (1965); *Smith v. Smith,* 67 Idaho 349, 180 P.2d 853 (1947); and *Jain v. Priest,* 30 Idaho 273, 164 P. 364 (1917), all concerned attempted adoptions under a statute authorizing adoptions without consent of

the natural parent in cases of abandonment, cruelty or neglect by the non-consenting natural parent. A careful reading of those cases discloses that the decisive issue was not any particular presumption in favor of natural parents but the fact that the statutorily required showing of abandonment, cruelty or neglect had not been made. In *Bedal v. Johnson,* 37 Idaho 359, 218 P. 641 (1923), the Court upheld a contract for adoption, declaring that such contracts were no longer against public policy. The majority's reason for citing that case entirely escapes me.

129 P. 423, 426 (1912) *quoted in Welfare Division v. Maynard*, 84 Nev. 525, 445 P.2d 153, 155 (1968).

The fears which seem to be the basis for the majority's rejection of the best interests of the child standard and their reliance upon "the inherent rights of natural parents" are misplaced in this case. From the New York Court of Appeals ill-fated decision in *Scarpetta*, the majority quotes the following language: "[The] contest between a parent and nonparent [may not] resolve itself into a simple factual issue as to which affords the better surroundings, or as to which party is better equipped to raise the child." *Ante* at 966. From an Oregon intermediate appellate court decision the majority quotes: " '[C]ourts should not interfere with the natural relationship of parent and child upon the sole ground that the proposed adoptive parents are able to give the child superior advantages over those within the means or social status of the natural parents . . . .' " *Ante* at 966, 967.

Though not precisely stated, these quotations and the majority's comments concerning the best interests of the child standard and the rights of natural parents reflect a concern that wealthy and prominent couples desiring to adopt a child not be able to take advantage of the confusion and emotional turmoil of a new mother who, though comparatively poor and disadvantaged, is nonetheless a competent and loving parent. The majority seems to fear that such couples may be able to gain permanent custody of the child by dazzling judges with their superior economic means and social status. In our present society, with numerous couples waiting years in order to adopt one of the limited number of available children, such concerns cannot be lightly dismissed, and the courts must be vigilant in guarding against this danger. But such concerns, which are relevant to whether the consent was freely and knowingly given, are misplaced here. The record indicates that the appellants are of very moderate means, though of sufficient means to adequately raise the child. It must be remembered that here the natural mother sought out the

appellants. There is simply no indication of any undue influence or improper conduct on the part of the appellants. Rather, the entire episode was initiated and orchestrated by the natural parents. In affirming the setting aside of this adoption because of fears that clever, wealthy couples may improperly obtain the children of unwitting mothers, the majority is courageously though needlessly jousting with imaginary problems while trampling under the interests of a very real child.

## II

I turn now to the procedural argument advanced by the appellants that the *habeas corpus* proceeding was an improper collateral attack on the adoption decree. Here again, it is important to bear in mind what is and what is not an issue in this appeal. There is no question that the respondents have the right to raise and litigate the revocation question. The procedural question raised here is whether they selected the proper forum and procedure to do so. The issue is whether the respondents were entitled to collaterally attack in the *habeas corpus* proceeding the adoption decree or whether their remedy was limited to a direct attack by appeal or by a motion under I.R.C.P. 60(b).

The general rule is that a judgment is not subject to collateral attack where the court entering the judgment had jurisdiction of the subject matter and the parties. 1B Moore's Federal Practice ¶ 0.405[4.–1] (2d ed. 1965); 46 Am.Jur.2d, Judgments, § 621 (1969). In *Hartenbower v. Mutual Benefit Life Ins. Co.*, 67 Idaho 254, 175 P.2d 698 (1946), this Court held that any jurisdictional defect permitting a collateral attack "must appear on the face of the judgment-roll." 67 Idaho at 260, 175 P.2d at 701. *See Finn v. Rees*, 65 Idaho 181, 141 P.2d 976 (1943); *School Dist. No. 1 v. Snowflake Union High School Dist.*, 100 Ariz. 389, 414 P.2d 985 (1966).

Accordingly, even an erroneous judgment may not be collaterally attacked unless the judgment reveals on its face a jurisdictional

defect. This rule is necessary to protect the integrity of judgments and our judicial system. One commentator has summarized the purpose of the rule as follows:

"If, whenever a judgment were called in question, the court in this proceeding could review the matter previously adjudged to determine whether there had been error, a judgment would have no finality; immortal litigation would overcome mortal man; and the sound principle of fundamental repose, which underlies res judicata, would be subverted." 1B Moore's Federal Practice, *supra* at 635–36.

These principles against collateral attack are applicable to adoption proceedings and decrees. *See, e. g., Smith v. Smith*, 67 Idaho 349, 180 P.2d 853 (1947); *Finn v. Rees, supra*; *Jones v. Jones*, 215 Kan. 102, 523 P.2d 743 *cert. denied* 419 U.S. 1032, 95 S.Ct. 515, 42 L.Ed.2d 307 (1974); *cf. Mitchell v. Pincock*, 99 Idaho 56, 577 P.2d 343 (1978) (full faith and credit to California guardianship judgment). A *habeas corpus* proceeding which challenges an adoption decree is generally considered a collateral attack. *See Finn v. Rees, supra.* In sum, the crucial issue is whether the adoption decree is jurisdictionally defective on its face.

The order of adoption was entered by an attorney magistrate who had jurisdiction over the subject matter. I.C. §§ 16–1506 and 1–2210; I.R.C.P. 82(c)(2)(B); Idaho State Bar, Desk Book, Local Dist. Ct. Rules, 7th Jud.Dist. 4 (1977). The adoption order states that the natural parents' consents to adoption, properly acknowledged, were filed with the magistrate. Under our adoption statute these consents provided the magistrate with personal jurisdiction over the natural parents and made them parties to the adoption proceedings. I.C. § 16-1506 provides that a consent to adoption, properly acknowledged and filed with the court, "shall be deemed a sufficient appearance on the part of such person or persons." I.R. C.P. 4(i) provides that "[t]he voluntary appearance of a party . . . is equivalent to personal service of the summons and a copy of the complaint upon him." By providing that a consent is a procedural equivalent of a voluntary appearance, the legislature enabled the court to enter an order of adoption which would be binding on the natural parents without their being served with process. *Cf.* I.C. § 16–2007 (waiver of notice and hearing on petition to terminate parental rights); *D. H. Overmyer Co. of Ohio v. Frick Co.*, 405 U.S. 174, 92 S.Ct. 775, 31 L.Ed.2d 124 (1972) (waiver of due process rights of notice and hearing). This procedure facilitates the consummation of an adoption under the statute while at the same time maintaining anonymity between the natural and adoptive parents. I also note parenthetically that the consent forms used in this case were prepared by an attorney for the natural mother after she and a social worker consulted with the attorney concerning the procedure for placing her child up for adoption.

The majority acknowledges the effect under our adoption statute of the consent filed with the magistrate, *ante* at 959, but then misapprehends its significance with respect to the collateral attack issue. The majority finds that the respondents' revocation of their consent to adoption was also effective as a revocation of their waiver of the right to notice and to appear. The majority therefore concludes that the adoption decree is not entitled to *res judicata* effect and may be collaterally attacked. In making the leap from its premise to its conclusion, the majority confuses the merits of the revocation issue with the procedural question. In determining whether the adoption decree is subject to collateral attack the focus of a court's inquiry is not on what actually occurred—the court is not to relitigate the issues—but the proper focus is on what the magistrate ruled, as indicated on the face of the judgment. If the decree is in error, the procedure for correcting the mistake is a direct attack, not a collateral attack.

The adoption decree involved in this case does not reveal on its face any jurisdictional defects. On its face it is indistinguishable from an adoption decree in a case where the

natural parents never attempted to revoke their consent. In their *habeas corpus* proceeding the respondents sought to contradict the decree by arguing that in fact there had not been a proper consent to the adoption. As such, the *habeas corpus* proceeding was an impermissible collateral attack on the order of adoption and should have been dismissed for that reason.

The Court's recent decision in *Mitchell v. Pincock, supra,* is also applicable to this case. In *Mitchell,* the petitioner, a natural mother, sought through a *habeas corpus* proceeding the return of her child from the respondent, a stranger who had failed to return the child as required by a California judgment. Because of constitutional principles of full faith and credit and the rules of *res judicata,* this Court refused to permit the respondent in that case to relitigate in the *habeas corpus* proceeding matters resolved by the California judgment. The Court held that in order for "[t]he seemingly endless litigation [to] be stopped," 577 P.2d at 345, the respondent could not attack the California judgment in the *habeas corpus* proceeding and that her remedy was limited to direct attacks and appeals, which in that case had previously failed. In the instant case the majority is allowing the respondents in this appeal to do what the Court held the appellant in *Mitchell* could not do, *i. e.,* attack in a collateral *habeas corpus* proceeding matters covered by a valid judgment from a different proceeding.

The proper procedure for the natural parents to raise the revocation issue is a direct attack on the magistrate's decree of adoption, either by appeal or by a motion under I.R.C.P. 60(b). In the circumstances of this case I believe the preferable procedure is a 60(b) motion, since an appeal would present the reviewing court with an issue not presented to the trial court and to which a proper record had not been made. The record here does not indicate that an appeal was taken from the magistrate's decree. However, after the district court ruled on the petition for the writ of *habeas*

*corpus,* the respondents filed a 60(b) motion to set aside the order of adoption. The record does not indicate whether any action has been taken on that motion.[3]

The district court in its memorandum decision acknowledged the procedural problems raised by the *habeas corpus* proceeding:

"There are procedural difficulties with a determination of the merits of the case upon the hearing had on Habeas Corpus. This because the response to the Habeas Corpus writ discloses that the Respondents are the adoptive parents, as aforesaid, and the Order of Adoption gives them lawful custody, to say the least. They are now the parents of the child and the Petitioners stand as foreigners under the adoption decree. In that sense, the Habeas Corpus proceedings is a collateral attack on the decree. If this action were instituted other than in the District Court in and for Bingham County, the very Court that entered the adoption decree, it is thought the procedural difficulties might be even more complex."

After noting that the magistrate division is a division of the district court and discussing the procedure for attacking the adoption decree under I.R.C.P. 60(b), the district court nevertheless concluded that it could properly reach the merits of the revocation issue in the *habeas corpus* proceedings:

"As the issues appear after the hearing, the remedy of habeas corpus in the opinion of the Court is a proper remedy to reach the issues. The substance of the procedure is similar as though the matter had proceeded through Rule 60(b), and it matters little how the procedure be named or designated where the Court alignment is as noted above. It is thought the issue could not be more squarely presented than has been done."

Although the district court judge perceived the procedural problems in the case, the district judge was mistaken in concluding that the *habeas corpus* proceeding was

---

3. Respondents, in their brief, admit that they failed to comply with the requirements of I.R.

C.P. 7(b)(3) when they prepared and filed their motion under I.R.C.P. 60(b).

proper since the issues were clearly joined and since the order of adoption was entered by a magistrate sitting in the same judicial district and county as the district judge. I recognize that for administrative convenience petitions for adoption are filed, as are all actions, in the district court, I.C. §§ 1–104 and 16–1506, and that the magistrate division is a division of the district court, not a separate court. Adoption petitions are heard by magistrates because the district court judges, pursuant to I.C. § 1–2210 and I.R.C.P. 82(c)(2)(B), have granted such jurisdiction to the magistrates. Where the district judges, pursuant to those provisions, grant jurisdiction over adoption proceedings to attorney magistrates, the magistrate division acquires general jurisdiction over adoptions. *Cf. Finn v. Rees*, 65 Idaho 181, 141 P.2d 976 (1943) (former probate court). A valid judgment of a magistrate therefore has binding *res judicata* effect in all the nation's tribunals, both federal and state. *See Chais-Shulman v. Bank of America Trust No. 54212*, 456 F.2d 253 (9th Cir. 1972); *City of Brady v. Finklea*, 400 F.2d 352 (5th Cir. 1968); 1B Moore's Federal Practice, ¶ 0.405[4.–1] (2d ed. 1965). In my view, this includes district judges in the same judicial district and county as the magistrate entering the order. In a collateral proceeding, district court judges are bound by the valid judgments of magistrates within their judicial districts, just as the judges in any other state or federal court are bound by such judgments. District court judges may set aside the valid judgments of magistrates within their judicial districts only when reviewing those cases by way of appeal. *See* I.C. §§ 1–2213 and 16–1512; I.R.C.P. 83; *see also Koester v. Koester*, 99 Idaho 654, 586 P.2d 1370 (1978).

Furthermore, a motion under I.R.C.P. 60(b) would be properly directed to the magistrate who entered the order of adoption. The court in the best position to hear and decide a challenge to an adoption order, such as the challenge raised by the respondents in this case, is the tribunal which originally heard the adoption petition. The federal courts, in applying F.R.

C.P. 60(b), have generally ruled that such motions must be made in the court which rendered the judgment because that court is far more familiar with the case and with the circumstances forming the basis of the motion. 11 C. Wright & A. Miller, Federal Practice and Procedure, Civil § 2865 (1973). Such observations are equally applicable to 60(b) motions attacking a judgment entered by the magistrate division.

For these reasons I would reverse the district court judgment in the *habeas corpus* proceeding. Since no action appears to have been taken in the magistrate court on the respondents' motion under I.R.C.P. 60(b) to set aside the order of adoption, that matter is not now before this Court.

SHEPARD, C. J., concurs.